Syllabus.

GEORGE W. SPARKS, EDWARD MOORE, WILLIAM G. LOWE, ROBERT D. HICKS AND HENRY S. McCOMB,

*vs.*

THE PRESIDENT, DIRECTORS AND COMPANY OF THE FARMERS' BANK OF THE STATE OF DELAWARE.

*New Castle, Feb. T., 1869.*

Where A becomes surety for the faithful discharge of B's duties, as cashier, the obligation continues so long as B holds the office by virtue of the appointment under which the bond is given. Though the office be usually treated an elective for one year only, yet the surety will be liable for B's acts if B continue in office after the year. But on B's re-election and qualification for a second term, the liability on the old bond ceases.

If the term of an officer, created by a statute or charter, is not limited to expire at a fixed time, or upon a specified event, but there is merely a direction for his annual election, his original term continues, though after the year, until a successor be duly elected and qualified.

Where neither the charter nor by-laws of a corporation fixes the term of office of its cashier, but vests the appointment of all officers in the " directors for the time being," a cashier so appointed, holds his office during the pleasure of the directors, unless they, at the time of appointment, limit the duration of his office to a specified term.

Under such circumstances, a general resolution of a board of directors, that the cashier should be annually elected, and the practice of that and subsequent boards, to hold elections annually, constituted him an annual officer in a certain sense, but not so entirely as to make his term of office expire *ipso facto*, at the end of the year. It is a question of what term the board intended to elect for. And where the charter prescribed that the cashier, before entering on the duties of his office, should give bond, &c., it will be presumed that the board intended the old cashier to continue in office until the new one should not only be elected, but qualified to take his place.

Therefore, where a cashier was elected, and gave bond in one year, and was re-elected the next year, but failed to give a new bond, it was held that he was in office by virtue of his first election, and his sureties were liable for his acts during the second year.

The fact that the bank neglected to have the cashier's bond renewed on his re-election, whereby the bond of the original sureties remained in force

after the period they had been led to expect, does not estop the bank from proceeding on the bond; it not appearing that the expectation as to the time their bond was to be in force,was due to representations by the bank.

Nor is the bank estopped by its failure to examine the cashier's accounts with such frequency as to discover his defalcations within the year in which they took place. The bank owed the sureties good faith, not diligence.

In a court of equity, the statute of limitations on a cause of action which has been fraudulently concealed, runs from the discovery of the fraud. This principle applied to a defalcation by the cashier of a bank, though a more frequent and diligent examination of his affairs, by the officers of the bank, ought to have disclosed the defalcation within the statutory period after its occurrence.

BILL IN EQUITY BY SURETIES FOR AN INJUNCTION.— This was a bill in equity by the sureties in official bonds of Joseph A. Heston, late cashier of the Farmers' Bank, to restrain the bank from proceeding at law to collect from complainants the amount of certain alleged defalcations of Heston, committed while cashier.

The bonds bore date, respectively, January 1, 1862, and January 6, 1865. The complainants were the sureties in each, and the two bonds were precisely alike in their terms, being each in the penal sum of fifty thousand dollars, and upon condition, "that if the above bound "Joseph A. Heston shall behave himself well and faith- "fully discharge his duties as Cashier of the Branch of the "Farmers' Bank, at Wilmington, then the above obliga- "tion to be void, otherwise to be and remain in full force "and virtue in law."

Each bond contained a warrant of attorney for confessing judgment, which had · been executed by the entry of judgments at the November term, 1866, of the Superior Court, in and for New Castle County, being No. 392 on the bond of January 6th., 1865, and No. 393 on the bond of January 6th., 1865. Under these judgments the bank was proceeding to collect the amount of the alleged defalcations when restrained by the injunction.

The amount claimed on account of the alleged defalcations was made up of a deficiency in cash, represented by three checks on the bank, drawn by Heston to his own order, amounting in all to $9134.90. There was also an additional amount, in which the cash was found to be short, on March 2nd, 1867, $986.97, making in all $10,121.87.

There were also claimed, in addition to this amount, an over-draft on salary account of $62.31, and the amount of a check of Samuel Biddle, for $101, found among the assets with which he was chargeable, not charged to Biddle, his account being balanced, but held by Heston as cash. These two items were not treated by the Court as established.

The three checks making up the $9134.90 were dated as follows :—

December 1st, 1864, $3046.46 ; September 5th, 1866, $5588.44 ; January 15th., 1867, $500, and these dates, together with March 2nd., 1867, as to the $986.97, were found by the Court, upon the proof, to be the respective dates of the defalcations.

It was objected by the sureties that the books of the bank were so loosely kept that no correct ascertainment could be made of either amounts, or dates of defalcations, as had been shewn by the fact that four distinct amounts had been claimed by the bank.

The complainant's claim to relief, was based upon three grounds of equitable defense against the right of the bank to enforce their judgments. The chief of these was that the office of cashier was an annual one, and that they were liable upon each of the bonds only for defalcations occurring within the current official year at the beginning of which it was given.

It was further claimed that no defaults had occurred in the years 1862 and 1865.

The banking corporation had, what was termed, the "general board," which met at the principal bank, at Dover, twice each year, and the election of the cashier occurred at the meeting of that board, in January. This general board consisted of the directors of the principal and branch banks meeting together, each of them having a board of directors for the management of its ordinary banking business.

Heston's first appointment was a temporary one, to fill a vacancy made by the directors of the branch bank at Wilmington, February 13, 1858, and continuing until the meeting of the general board, in January 1859. He was then regulary elected, and subsequently re-elected by the general board, in January of each year, until 1867, the year in which he was removed. He gave a new official bond in each of the years 1859, 1860, 1861, 1862 and 1865. For reasons not necessary to be stated, the taking of bond was dispensed with in 1863 and 1464.

The by-laws and ordinances of the banks, the minutes of the general board and of the directors of the branch bank at Wilmington, the books of account of the latter were among the documentary evidence.

The charter of the bank was passed February 4th, 1807, and was renewed February 7th, 1822, February 27th, 1837, and February 13th, 1855. Under it the power to appoint officers, and generally to govern the corporation, was vested in the "directors for the time being." No term was annexed to the office of cashier. The charter provided for the qualification of cashiers by taking the oath and giving bond.

The practice of electing cashiers, as shewn by the minutes, was not altogether uniform. The bank was organized in 1807, and until 1810 cashiers were elected annually. From then until 1823, there were no elections except to fill vacancies. In 1823 the officers were re-elected and required to give bond. In 1824 there was no

election, but in 1825 they were elected, and the following resolution on the subject was passed :

"*Resolved further*, That the persons to fill the "respective offices of cashiers and clerks, in the different "departments of this bank, shall be balloted for at the "present meeting, and, annually, at the meeting of the "general board of directors, in the month of January of "each year hereafter, and shall,on entering upon the duties "of those offices, respectively give bond and warrant of "attorney, in the manner and form prescribed by the Act "of Assembly in such case made and provided."

An accompanying resolution directed the cashiers to to take certain proceedings for the collection of interest due and in arrears more than twenty days prior to the semi-annual dividend period, and added, "that the cashier "or cashiers who shall neglect or refuse to comply with this "provision, shall not be allowed to be nominated or voted "for at annual elections thereafter, to fill the said office, but "be wholly excluded therefrom."

In 1826, officers were elected, and the following resolution was passed :—"That the cashier and clerk of the "principal bank, and the cashiers and clerks of the respec- "tive branch banks,enter into bond with surety and sureties, "and warrants of attorney, conditioned, as provided by law, "for the faithful performance of their offices, as required by "a former by-law or by-laws of this institution, and that "such bonds be duly executed and submitted for their "approbation to the respective boards of directors, within "twenty days after their appointments, respectively, in the "present and subsequent years."

In 1827, and since, cashiers and tellers were elected or re-elected annually, and have, upon each election or re-election, given bond and taken the oaths, except in 1863, 1864, 1866 and 1867.

The further proceedings of the general board, and also of the directors of the branch bank at Wilmington,

as appearing upon the minutes, which were material to the case, are sufficiently stated, in the opinion of the Court.

The second ground of relief was the neglect of the directors of the branch bank to supervise, properly, the affairs of the bank, and upon this subject, testimony was adduced which is not material to the legal views upon which the Court proceeded.

The other ground of relief was the statute of limitations, under which it was claimed that the sureties were discharged as to so much of the defalcation as occurred more than two years prior to the entering of judgment on the bonds in March, 1867.

The cause came on to a final hearing at the February Term, 1869.

*T. F. Bayard*, for the complainants.

Consider, first, how such obligations as those here involved are affected by general statutes. The *Revised Code, Ch.* 123, *Sec.* 11, limits suits upon the official bonds of corporate officers to the period of two years, and directs the renewal of such bonds, at least, every six years. The object of all this was to protect sureties against indefinite liabilities, which, otherwise, by general law, they would rest under.

The office of cashier was an annual one.

The power of appointment was in the general board. *Charter, Sec.* 11. There is no other deposit of power except this one in the "Directors, for the time "being", *i. e.*, of the corporation. The power in the general board was, and continued to be, unqualified. There was no power of appointment vested, by the charter, in the branch bank, and appointments by the branch

banks are, in fact, as shewn by the minutes, approved at Dover.

And we find the usage of the corporation consistent only with this construction, and that usage would be sufficient for this case to establish that this was an annual office. But it does not stand on usage only, but is expressly determined by the resolutions of 1825, subsequently acted under without interruption.

Again so far as concerns the sureties if the corporation by its acts has so held itself out that no other construction can be reasonably made by a person dealing with them.

The records of the bank shew an annual election, and since 1813 the officers have been annually sworn. Upon the elections, there follow each year, official bonds regularly given, up to 1863. Such is the testimony of the records, and it cannot be controverted by parol evidence of Bank Directors. Dewey J. in *Amherst Bank vs. Luther Root and others* 2 *Metc.* 522. Hence, then, the doctrine of estoppel applies, and the bank, by its own records and proceedings, are estopped to deny that the office was filled by annual elections, and is an annual one. *Dutchess of Kingston's case,* 2 *Sm. L. C.* (459 *i.*) *English note.*

The whole proceedings and minutes of the bank if to the sureties or inquired of by them must have made the impression that their obligation would be for the year only.

Contracts of suretyship for official duty, or trust, doubtful as to extent, are construed favorably for the surety, and against *indefinite* liability. *Addison on Cont.* 663 ; *Ludlow vs. Simonds* 2 *Caines Cas. in Eq.* 1 ; *Miller vs. Stuart,* 9 *Wheat.* 981.

Where the bond states no term, but the office is, in fact limited as to term, the liability is limited to the actual term. *Add. on Cont.* 660 ; *Angell & Ames on Corp. secs.* 228, 322 ; *Lord Arlington vs. Merrick.* 2 *Saund.* 404, 415 ; *Augero vs. Keen,* 1 *M. & W.* 390 ; *Kipson vs. Julian,* 30

*Eng. L. & Eq* 326 ; *Dedham Bank vs. Chickering*, 3 *Pick* 341 ; *Amherst Bank vs. Root*, 2 *Metc.* 532.

A re-appointment of the same person is of the same effect as the appointment of a new officer. *Bigelow vs. Bridge*, 8 *Mass.* 275 ; *Southwark vs. Bostwick*, 4 *B. & P. New Edition*, 175 ; *Liverpool Water Works Co. vs. Atkinson*, 6 *East.* 512.

But the act of limitations is another distinct ground of relief. *Rev. Code* 44, *sec.* 11. The "cause of action accrued" when the default was committed, not when it was discovered. *Add. on Cont.* 1207.

In *Bank of Wil. and Br. vs. Wollaston*, 3, *Harring.* 90, relied on by the defendant, the condition was "to pay "and deliver," hence the cause of action accrued then, on default in paying over on removal.

Here we have no such condition, and the default must have occurred within two years of the entry of the judgment, and the *onus* is on the defendant to shew that fact.

*Bradford* and *Higgins*, for the defendant.

*First.* Assuming that this is an annual office, and admitting the law applicable, as stated, we could recover nothing on the bond of 1862, no defalcation being in that year. But there was a breach of the condition of the bond of 1865 within that year, under which we would be entitled to recover the amounts covered by the false entry of April 6, 1865, of $6503.65, and the deficiency shewn on a count of the funds, April 13, 1865, of $1001.93.

*Secondly.* Admitting the power of appointment to be vested in the general board, we contend that they have not made the office an annual one, and proceed to consider the liability under both bonds.

The original appointments were all for *indefinite terms.* It was not then considered or made an annual office, (1)

36

by terms of election or grant of authority ; (2,) by any declaration of charter ; (3,) by any by-law or ordinance, or, (4,) by any condition of bond.

In the proceedings of the corporation, there is nothing to indicate an annual office beyond mere re-election, which was wholly a supererogation, not necessary, and not always resorted to.

The grounds urged as evidence that the office was an annual one, are : 1, The yearly elections. 2. The orders of 1825-6. 3. The order for yearly bonds in 1826, and their being taken. 4. The annual oaths.

The claim is not based upon charter, ordinance, by-law, condition of bond, or terms of appointment. Consider these grounds in order.

1. Yearly elections, up to 1825, do not make an annual office. *Dedham Bank vs. Chickering*, 3 *Pick.* 335.

2. The orders of 1825-6 as an ordinance, or by-law, were void *ultra vires*, the stockholders alone having authority under the charter to make by-laws. The resolutions were a mere declaration of purpose made to themselves only, not of any binding force, and not of itself affecting the general tenure of office. They do not even purport to limit the term ; that must be determined only by the terms of the appointment, where the power to appoint is general, and there is no controlling law or rule limiting the office.

3. As to the yearly bonds, although the law requires a bond on entering into office, the converse is not true, that taking bond creates a new office. For many reasons, new bonds may be periodically required, both for the benefit of sureties and the bank, to bring the responsibility of sureties under review, and, if necessary, new security may be required. Hence, the taking of new bonds is not

conclusive as to the term of office. *Bank of the U. S. vs. Dandridge*, 12, *Wheat.* 65.

4. The same argument applies as to the inconclusive-ness of annual oaths. The President and Directors were, by charter, required to be sworn ; hence, the fashion of including the other officers. There never was any order for it.

On the other hand, observe the evidence of intention not to make the office an annual one.

1. No election, at any time, by either board, in terms for a year, while it was easy and natural to do so if intended.

Though there was a form of election, it was unneces-sary, and did not terminate the previous authority, but only continued it for a year. *Dedham Bank vs. Chickering*, 3 *Pick.* 340 ; *Amherst Bank vs. Root*, 2 *Metc.* 539 ; *Union Bank vs. Ridgely*, 1 *Hart. & Gill*, 327 ; *Hughes vs. Smith*, 5 *Johns.* 168 ; *Ang. & Ames on Corp. sec.* 322.

2. There was never any order to elect for a year.

3. Neither by ordinance, by-law, or regulation, has the office been declared an annual one.

4. The effect would be to discontinue the bank and its business, should a quorum not be present the next year. There is no valid election without a quorum. Here, there is a distinction between the body at large, and a select body. Of the latter, a majority must be present. 2 *Kent. Com.* 367 ; *Angell vs. Ames on Corpns. sec.* 501, *p.* 561 ; *Rex vs. Barlow, Cowp.* 248 ; *Rex vs. Bellringer*, 4 *T. R.* 810 ; *Rex vs. Miller*, 6 *T. R.* 268 ; *Rex vs. Morris*, and *Rex vs. Steward*, 4 *East.* 17 ; *Ex parte Willcock, et al.* 7 *Cow.* 402.

5. The practice of the bank, in its original appointments and dismissals, indicates the exercise of control, at all times, over its officers, by both principal and branch banks.

*Thirdly.* Consider the power of appointment in the branch board.

1. As a question of construction upon the charter.

Though but one incorporation, there were four separate organizations with distinct and independent functions.

The power of appointment is vested in the directors, in their relation to the corporation, *i. e.*, as branch directors, and not as members of the general board, as a distinct function. The directors sustain a twofold relation, *i. e.*, as directors of the principal or branch bank, and as members of the general board. They can hold no other relation to the corporation. The directors of each bank are a separate body from the general board. As directors of each bank, they are charged with the powers entering into the management of that bank. As a general board, they are charged with what concerns the interest and management of the whole.

By *sec.* 11, 4 *Del. Laws*, 94, the general power is vested in the director for the time being. This phrase is satisfied either by the general board or separate boards,— directors either in their separate relations, or as members of the general board. The power here vested is full and complete, simple, absolute, exclusive, in whatever body it is that is here described, and it cannot be delegated. No provision is made for a substitution of authority.

The objections to the theory of appointment by branch board, to be confirmed or extended by the general board, the only opposite theory open, are that it must involve a concurrent exercise of power, inconsistent with the nature of the power granted, such as has always,

in fact, been exercised, or if not concurrent, yet a division of the power, or of nomination subject to approval.

On the other hand, it may be said of our construction.

1. It is consistent with language of Section 11.

2. The only express power of appointment given to the general board is of *Presidents*. Secs, 8 *and* 9, *and expressio unius, exclusio alterius*.

3. There are some expressions to supply the vacancies, yet none for the vacancy of *cashier ;* yet the want of a quorum of the general board would disable it, sometimes, from appointing ; the presumption is, that the power is not intended to be exercised by a body in which it might sometimes fail.

4. The power is to appoint officers "under them," *i. e.*, under the respective boards ; branch cashiers are not, in a *direct* sense, *under* the general board.

5. The same Section 11, comprehends this power of appointment, with all such others as may be necessary or may be enjoined by by-laws or ordinances ; and among these are many or all of which are necessarily local, as banking hours, modes of discounting, &c.

6. The power is given to the Wilmington branch, specifically, by its charter. 4 *Del. Laws*, 594. " Management of said bank" to nine directors,—"powers co-ordinate with those of other branches."

" Management" involves control of its officers, which includes power to appoint and remove.

7. This construction is to the interest of the corporation. The power is most beneficially exercised by branch banks, from their personal knowledge.

8. This construction, *in the main*, is according to the practice, at least, not contrary, though there were exceptional acts of the general board.

The original appointments by the general board were under special power, and provisional, entering into the establishment of banks. So the first appointments at Wilmington.

The re-elections, up to 1810, are, so far as they go, against us; but after that, for years, up to 1825, no re-election and appointments were made by branch bank, or resignations to it.

As to salaries, the practice was variant:—at first paid by the general board; later by branch boards.

A clear construction of a power, according to the charter, is not to be set aside by mere usurpation on the part of past sets of directors.

9. Nor is this construction contrary to the act of 1849, in 10 *Del. Laws*, 392, providing that a vacancy in the branch bank is to be filled by the branch board, by appointment, to continue until the annual meeting in January of each year.

This is not conclusive. Cashiers and tellers are not named. The question is, was there, under prior acts, a power of appointment, in the branch banks, for cashiers? This is to be determined by the prior acts alone. Then if so, the act of 1849 does not take it away. Its design was not to divest any pre-existing power, but to supply certain powers to appoint, not before given to branch banks. General terms are used, because designed to reach any appointment which, without it, the branch bank could not make; a design best effected by not attempting to specify. The appointments, *in fact*, contemplated, were of directors and presidents, the former to hold until the meeting of stockholders, the latter

until the meeting of the general board. All officers are thus satisfied, and is a phrase to be construed by the subject-matter, by applying it to the officers for whom the provision was necessary.

*Fourthly.* The liability of the sureties, if the office is held to be indefinite, unquestionably, covers the whole amount claimed as in default. They are the same sureties in both bonds and are liable under the bond of 1862, until January 1865, and under the bond of 1865, since that date.

It does not matter, in a court of equity, whether the whole defalcation can be accurately apportioned as to time between the periods covered by the respective bonds, if the two, taken together, cover the whole period of defalcation.

*Lastly.* The Statute of limitations, as to the sum of $6503.65, did not begin to run until the date of the false entry, April, 6, 1865 which was within two years.

And even supposing the defaults occured before 1865, the case is taken out of the statute by Heston's admissions. *Amherst Bank vs. Root,* 2 *Metc.* 541—2 ; 1 *Saund. Pl. & Ev.* 62 ; *Burleigh vs. Stott,* 8 *B. & C.* 36 ; *Channel vs. Ditchburn,* 5 *M. & W.* 494 ; *State vs. Whittaker,* 2 *Harring.* 136 ; *Bank of Wil. & Br. vs. Woolston,* 3 *Harring.* 91.

In the case last cited, in applying the statute of limitations, the breach is treated as occurring when the officer, on removal, fails to pay over the assets. The condition in Heston's bonds though, in general terms, includes all that was specified in Woolston's bond.

THE CHANCELLOR :—

The sureties claim to be relieved upon three distinct grounds.

1. The ground chiefly relied upon was, that their obligation under each of these bonds was for Heston's good behavior as cashier, *only during the current year*—commencing with his election by the general board at Dover, at its annual meeting in January next, before the taking of the bond, and ending, *ipso facto*, upon his re-election by the same board in January next following; that is to say, that under the bond of 1862, the sureties were liable only for such defaults as might be committed within the year 1862, and until Heston's re-election in January, 1863 ; and that, under the bond of 1865, they were liable only for defaults committed within that year and until his re-election in January, 1866 ; and, further, that no defaults were committed within the years 1862 and 1865.

Heston was first chosen cashier by the directors of the branch bank of Wilmington, February 13, 1858. This was a temporary appointment, continuing until the meeting of the general board, in January 1869, when he was regularly elected by the board. Subsequently, he was re-elected by the general board, in January of each year, until 1867, the year in which he was removed. After each of these elections, he took an oath'of office. He also gave a new official bond in each of the years 1859, 1860, 1861, 1862, and 1865. For reasons not necessary to be stated, the taking of bond was dispensed with in 1863 and 1864.

The bonds are taken in the corporate name of the principal bank, and to each there is a condition, without any recital preceding it, in these words :

"The condition of this obligation is such, that if the "above bound Joseph A. Heston shall behave himself "well, and faithfully discharge his duties as cashier of the "branch of the Farmers' Bank at Wilmington, then the "above obligation to be void, otherwise to be and remain "in full force and virtue in law."

Then follows a warrant of attorney for the confession of judgment, under which the bank was proceeding against the sureties when restrained by the preliminary injunction.

It will be observed that the obligation of the sureties is not, by the terms of the condition, or by any recital in the bond, limited to a definite period, as for a year ; but their undertaking is, for Heston's good behavior, "as "cashier." Then, according to a settled rule of construction, their obligation is coextensive with the duration of Heston's office. *Add. on Cont.*, 663. And to the rule, as thus stated, there should be added this qualification, viz : that the undertaking of the sureties in either bond, was for Heston's good behavior only so long as he should hold his office by virtue of that election pursuant to which the bond was given ; so that their obligation under such bond would cease, as well upon his re-election and qualification for a new term of office, as upon the election and qualification of another person as his successor. *Add. on Cont.*, 662, and cases cited ; *Bigelow vs. Bridge*, 8 *Mass.*, 274.

This leads directly to the main question discussed upon this branch of the case, viz : Whether the office of cashier is an "annual office,"—one that expires at each annual meeting of the general board in January, upon the election of a successor, or the re-election of the incumbent —and if an "annual office," then whether the term of the incumbent expires *ipso facto* upon a new election in January, or continues until the qualification of his successor by giving bond, or upon his being himself duly qualified in case of his re-election. It is upon the latter question that the case will be found to turn.

It is very clear that, by no provision of the charter, nor by any by-law or ordinance of the stockholders, is the cashiership made an annual office or a term office of any kind, such as is the office of the president of the bank.

37

The charter, by *sec.* 11, (4 *Delaware Laws*, 494,) vests the appointment of all "officers, clerks and servants," of the corporation (which includes cashiers) in the "directors "for the time being." It confers a simple, absolute power, both of appointment and removal, affixing no term to the cashier's office, but making it subject to the pleasure of the board ; so that a cashier being elected, would, so far as the charter and by-laws affect his term of office, hold until his death, or resignation, or removal by some action of the board ; or, should the board have seen fit at the time of electing or appointing a cashier, to limit his term of service to a definite time, or to the happening of some specified event, his office would, in that case, expire at the time or upon the event designated. It would so expire, not by force of any limitation attaching to the office itself, but by the terms of the incumbent's appointment to it.

But it was insisted, for the complainants, that the office, though not made an annual one by the charter, by-laws or ordinances, has become such under certain resolutions adopted by the general board in 1825 and 1826, directing the annual election of cashiers, and by the uniform usage of the corporation since the adoption of those resolutions to hold annual elections in conformity therewith. Such action on the part of the general board, the body invested by the charter with the absolute control of the subject, is claimed to have all the force of a charter provision to constitute this an annual office.

Before taking up this question, it is necessary to advert to the practice of the general board, in the election of cashiers from the period of the bank's organization.

Prior to 1825, the action of the board was governed by no rule. From the organization of the principal bank, in 1807, cashiers for that bank and for the branches, were elected annually, until 1810. From that year until 1823 there were no elections except to fill vacancies, but the

cashiers remained in office without re-election. In 1823, the cashiers and tellers then in office, were re-elected, and were ordered, by a resolution, to give bond with surety for good behavior. In 1824, there was no election. In 1825, the board elected cashiers and tellers, and then, for the first time, adopted a rule intended to govern its future action, which (with some other matters) was embodied in a series of resolutions. The resolution relating to this subject was in these words :

"*Resolved further*, That the persons to fill the respec-"tive offices of cashiers and clerks, in the different "departments of this bank, shall be ballotted for at the "present meeting, and annually at the meeting of the "general board of directors, in the month of January of "each year hereafter, and shall, on entering upon the duties "of those offices, respectively, give bond and warrant of "attorney, in the manner and form prescribed by the Act "of Assembly in such case made and provided."

Preceding this, was another resolution, by which the cashiers of the respective banks were directed to cause proceedings for the collection of interest due and in arrears more than twenty days prior to the declaring of each semi-annual dividend ; and this duty was enforced by a declaration "that the cashier or cashiers who shall neglect "or refuse to comply with this provision shall not be "allowed to be nominated òr voted for at annual elec-"tions thereafter to fill the said office, but be wholly "excluded therefrom." In the next year, 1826, cashiers and tellers were elected, and a further resolution, evidently supplementary to that of 1825, was adopted respecting the bonds of these officers:—

"That the cashier and clerk of the principal bank, and "the cashiers and clerks of the respective branch banks, "enter into bond with surety and sureties and warrants of "attorney, conditioned as provided by law for the faithful "performance of their offices as required by a former by-law

" or by-laws of this institution, and that such bonds be duly "executed and submitted for their approbation to the "respective boards of directors within twenty days after ·' their appointments, respectively, in the present and subse- " quent years."

In 1827, and from thence until this time, cashiers and tellers have been annually elected or re-elected, and when elected or re-elected have given official bonds and taken oaths of office, except that, in 1863, 1864, 1866 and 1867, the bonds were dispensed with.

This reference to the transactions of the general board of directors presents all that is at present material, and I proceed now to state to counsel, the views formed, after much reflection, upon the points discussed touching the effect of the resolutions of 1825–6, and the subsequent practice of the general board.

1. And, first, there seems to be no doubt that the power of appointing cashiers for the branch banks is vested in the general board—the branch boards having only authority to fill vacancies occurring within the year, by temporary appointments, to continue until an election by the general board—an authority at first exercised from necessity, and since 1849 under the statute of that year, authorizing such temporary appointments of all officers of branch banks.

2. Further, I am of opinion that the resolutions of 1825–6, and the practice of the general board to elect the cashier annually, pursuant to its direction, did make the office, for the time being, " an annual office," though not so strictly such as to expire *ipso facto* at the end of the year, or at the annual meeting of the board, or even upon the election alone of a successor, or the re-election of the incumbent—not until both the election and qualification of the newly elected or re-elected officer.

It was insisted at the bar, that what purported, on the minutes of the general board, to have been re-elections of

incumbent cashiers from year to year, were not such, in fact, that they intended not to create a new term of office, but rather, as an annual assent to the continuance of the old term, the officer holding throughout, under his original appointment, so that Heston, notwithstanding these re-elections, continued to be cashier by virtue of his election by the branch board in 1858, without any change in his term of office. But the proceedings of the general board, as shown by the minutes, will not bear this construction. They had all the formalities of elections. As such they were minuted on the journals, and certified to the branch boards concerned, were invariably followed by new official oaths, and, with the exception before stated, by new official bonds. The proceedings were the same in all respects as for the election of the president, who, by the charter, was an annual officer. They were manifestly intended as annual elections of the cashier, held in direct conformity with the resolutions of 1825-6.

In the Massachusetts cases, *Dedham Bank vs. Chickering*, 3 *Pick.*, 335, and *Bank of Amherst vs. Root*, 2 *Met.*, 523, successive re-elections of a cashier were held to be but expressions of assent to a continuing office, but these decisions rest upon special circumstances which distinguish those cases from the present one.

Again, it was argued that the resolutions of 1825-6, and the practice of the board pursuant to them, could not, of their own force, make the cashier's office "an annual office ;" that only a provision of the charter or a by-law could have that effect. This is true so far, that the resolutions, and the practice of the board, did not affix a term to the office, making it an annual one in the same sense as is that of the president of the bank, such that succeeding boards could not elect for a longer period than one year. It was a self-imposed regulation which any board might disregard. Nevertheless, inasmuch as the boards succeeding those of 1825 and 1826 have chosen to

conform to the resolutions, and to elect or re-elect cashiers annually, pursuant thereto, they have, by the terms of their appointment, made the office, in fact, for the time being, an annual one, though not so by law or charter. The question is simply one of intention on the part of the general board, for what term of service they intended to elect the cashier, whether for one year or indefinitely. Their intention may be implied as well as expressed. A special resolution of the board adopted at each annual election, defining the term of office thereby conferred, would, beyond all doubt, have limited it accordingly. Certainly, the general resolutions of 1825–6 serve quite as conclusively to define the term of office under the successive elections, since held pursuant to them.

3. But this brings us to the point which is decisive against this branch of the complainants' case. Although under the practice of the general board, pursuant to the resolutions of 1825–6, the cashier's office has become, in a general sense, an "annual one," the term of the incumbent cashier does not expire *ipso facto* upon the election of his successor, or upon his own re-election, but his term continues, and, by consequence, his official bond remains in force until his successor becomes qualified for the office by giving an official bond ; or in case of a re-election, until the incumbent shall be himself qualified in like manner for his new term of office.

Such is the effect of the resolutions and of the practice of the board. For, otherwise, there would not be a proper succession of cashiers qualified, as is required by the charter. There would be, annually, an interval between the election and the giving of bond pursuant to it, during which the bank would be without any official security whatever. It is to protect the bank against this very result, that a fundamental article of the charter (Art 8 of Sec. 12) requires that the cashier, *before entering upon the duties of his office*, shall be required to give bond ; and in conformity with this article, and to secure the same end,

the resolution of 1825, in providing for annual elections, expressly directs that the cashier-elect shall give bond "*on entering*" upon the office; and although, by the supplementary resolution of 1826, twenty days were allowed him within which to provide his sureties, it is to be twenty days after his appointment, not after his entry upon the office; so that, clearly, the giving of bond by a cashier-elect is to precede or, at least, be cotemporaneous with his entry upon office or upon a new term of office. Now, in the absence of any expression whatever, limiting the term of the incumbent cashier to expire *ipso facto* upon the next annual election or re-election, it is the reasonable construction of the resolutions of 1825–6, that the old term shall continue until the new term is duly entered upon, by the giving of an official bond in accordance with the eighth fundamental article.

The case is not within the point ruled in *Bank of the United States vs. Danbridge*, 12 *Wheaton*, 64. It was there held that, if a bank permit a person to act as cashier without his having given bond as required by the charter, his acts as cashier *de facto* will incur against the bank the same responsibilities and, to some extent, will acquire for it the same rights as if he had been duly qualified. But here the question is whether upon a fair construction of the resolution under which the cashier was re-elected, he is to be considered after a re-election as acting in his new term of office before security given for it, or in his old term continued until he shall be newly qualified.

There is a further consideration necessary to a complete view of the subject. It is this: In holding that the term of office of the cashier, under elections by the general board, pursuant to the resolutions of 1825–6, continues until there shall be a qualified successor in the same office, I have but extended to the resolutions of 1825–6 and the elections held under them the same principle of construction which the common law applies to like provisions

made by statute or charter for the annual election of officers.

The principle is, that if the term of an officer, civil or corporate, created by statute or charter, is not limited to expire at a fixed time, or upon a specified event, but there is simply a direction for the annual election of the officer, his original term continues, though after the year, until a successor is duly elected and qualified. It is true that this, as a general common law principle, has been doubted by Chancellor Walworth, in 1 *Paige*, 595. In 2 *Kent's Com.*, 295, the principle is treated as not definitely settled upon authority, though it is supported by the author's great name. It was also affirmed by the Supreme Court of New York, in *People vs. Runkle,* 9 *Johns.*, 147, and *Trustees of Vernon Society vs. Hill,* 6 *Cowen,* 23. The apparent uncertainty of the English authorities on this point is removed by discriminating between the cases arising under statutory provisions expressly limiting the office to expire at the end of the year, or directing that the election be held on a fixed day, and the cases in which a term is implied from the direction to elect annually, without limiting the election to a fixed day. A provision for holding an election *on a fixed day* was held to be *peremptory* ; but one for electing annually, without a day fixed, was treated as *directory* only. The distinction is one of questionable soundness; yet it harmonizes the cases, and gives certainty to the rule adjudged by them.

Of the former class was the *Banbury* case in 10 *Mod.*, 346, in which a corporation was held dissolved through a failure to elect a Mayor on a charter day, *it being a day fixed by the charter,* and no provision for continuing the office. It was against the mischief resulting from this class of decisions, in working the dissolution of corporations through the failure to elect on charter days, that the Statute 11, Geo. I, was passed eight years after the Banbury case—which statute provided that a corporation

should not be dissolved by a failure to elect on *charter day*. This statute simply extended to all corporate elections, even though appointed for a fixed day, or though the office was expressly limited to a year, the same principle which had already been adjudged to apply to offices held under a mere direction to elect annually. That this latter class of cases does not stand upon the Statute of Geo. 1., will appear from a slight reference to them. *The Queen vs. Durham*, 10 *Mod.*, 146, was in 11th Anne. It was a mandamus to restore to office a town clerk, to which the corporation returned that, under the charter, the clerk was to be *annually chosen*, and that the year had expired. The Court held the return to be insufficient, distinguishing between an officer made by charter *annuatim eligibilis* and an officer *eligibilis pro uno anno tantum*. "Though," said the Court, "he be *annuatim iligibilis*, he may con-"tinue town clerk, and will do so until they choose "another,"—"if the return had been *eligibilis pro uno* "*anno tantum*, his office would have expired at the end of "the year, whether they had chosen another or not." Another case, more like the present one, is in 12 *Mod.*, 256. There a successor to a constable had been elected, but not qualified; yet he was held not to be discharged until his successor was appointed *and sworn in*, "because the par-"ish cannot be without an officer." This principle was finally settled in England on appeal to the House of Lords and upon great consideration, in *Foot vs. Prowse*, 1 *Strange*, 625; 2 *Bro., Parl. Cas.*, 289. The Mayor of Truro was to be chosen from among the Aldermen, and in the presence of two Aldermen. The Aldermen were *annuatim elegendi*, but no election for Alderman had been held for several years. The present Mayor was chosen from among the Aldermen last elected and holding over—two of them being present. The Court of King's Bench held the election of Mayor void, for want of an annual election of the Aldermen. But upon error in the Exchequer Chamber, and, as it is reported, "upon two solemn arguments," the

38

judgment was unanimously reversed. It was held that the words *annuatim elegendi* in the charter were only directory, and that an annual election of the Aldermen was not necessary in order to make the election of Mayor good ; and the Court compared it to the case of a constable and other annual officers who, it was said, "are good officers after the year is out *until another is elected and sworn.*" On appeal to the House of Lords, this case was argued by counsel no less eminent than Sir Philip York, afterward Lord Hardwicke, against the validity of the election, and by Lord Talbot in support of it. The House of Lords affirmed the decision of the Exchequer Chamber, sustaining the opinion that the Aldermen held over. The question was never afterwards agitated in the English courts. *Foot vs. Prowse* settled the principle as to offices held *under a general direction to elect annually.* The Statute 11 Geo. I., passed while that case was pending in the Lords, extended the principle *to all corporate offices.* In some of the States, the Statute 11 Geo. I., has been re-enacted ; but independently of that Statute, the weight of authority is in favor of the rule, so far, at least, as the English decisions carried it. And Chancellor Kent, 2 *Com.*, 296, indicates his opinion that the Statute was but declaratory of the common law : *People vs. Runkle,* 9 *Johns.,* 157-8 ; *Trustees of Vernon Society vs. Hill,* 6 *Cow.,* 23.

Returning now to the present case, I am of opinion that the resolutions of 1825-6, and the practice of the general board under them, ought to be so construed as to preserve an unbroken succession of cashiers qualified according to the requirement of the charter. Such a construction is quite consistent with the language of the resolutions, is necessary in order to harmonize them with the eighth fundamental article of the charter, is supported by a reasonable presumption as to the intent of the board, and, moreover, it is in accordance with the effect given at common law to like provisions in statutes and charters for the election of civil and corporate officers.

For it will be observed that the resolutions prescribe no term for the office of cashier ; as that it shall expire upon a day specified, or upon the annual meeting of the board, or even upon an election being held. They simply direct that a cashier be annually elected—a provision quite within the common law principle which extends the term of the incumbent until there shall be a duly qualified succession in the office.

What then, we next inquire, is the effect upon Heston's term of office, and his official bonds, under the elections of 1862 and 1865 ? The re-elections of Heston in 1863 and 1864 were rendered ineffectual to create a new term of office by his omission to give bond pursuant to those elections, as required by the eighth fundamental article. His term of office under the election of 1862 continued, until, in 1865, he gave bond pursuant to his re-election in that year. So the term of office, commencing in 1865, continued until his removal in March, 1867 ; no official bond having been meanwhile given. It follows that the liabilities of the sureties under each bond being co-extensive with the term of office for which the bond was given, covered, under the two bonds, the whole period from the date of the bond of 1862 until Heston's removal from office in 1867.

But here we are met by an objection, argued with much ability and force, that the bank is *estopped* from holding the sureties liable under either bond beyond a year from the election pursuant to which the bond was given ; and this upon the ground that the sureties undertook for Heston under an expectation that their liabilities would be limited strictly to the ensuing year, an expectation induced by the very practice or usage on the part of the bank of annually electing cashiers. And especially was it urged that the sureties ought not to suffer in consequence of the departure of the bank, after they became bound, from its previous practice of taking a new bond

annually.   This is putting the objection in its strongest possible aspect.

The case lacks the essential feature necessary to entitle the complainants to protection under the doctrine of equitable estoppel, or as it is usually termed, estoppel *in pais*.   Assuming that the sureties were induced to engage for Heston under the expectation that his term was for a year only, and not to be extended by the omission in the following year to elect or re-elect and take new bond, still such misapprehension as to the extent of the liability they were about to assume *is not chargeable to the bank*.   There is no proof of any misrepresentation on the part of the bank or of its officers, nor of the withholding of any information sought from it, or which, unsought, it was its duty to give ; nor (and here is the point of the objection) was such misapprehension warranted by the practice or usage of annual elections.   For, in the first place, in the total absence of evidence to the contrary, the sureties are presumed to have understood the practice or usage according to its true construction and effect, that is, that, although the office was in a general sense an annual one, yet that the incumbent officer for whom they were about to engage would hold over until the election and qualification of a successor, or the re-election and qualification anew of the incumbent.   A mistake on this point cannot be assumed when none appears in proof. But, in the next place, if such mistake were shown to have existed, and to have influenced the sureties to become such, still it does not appear that they were denied, by the bank, access to its records or proceedings, or any information sought for in order to ascertain the precise extent of the liability they were about to assume.   On the contrary, in must be considered that their mistake (if such existed) was due to their own passiveness, caused by over confidence in Heston, and not to any breach of duty on the part of the bank.   I now speak of the case as it stood at the time the sureties became bound.

The subsequent omission of the bank to renew the official bond of the cashier on his re-election in 1863-4 and in 1866-7, may have been unfortunate ; but the extension of the term of office in consequence of an omission either to re-elect or to qualify the officer re-elected, was one of the liabilities comprehended in the obligation into which, the sureties entered, which, in the absence of proof, it must be presumed they understood ; or even if they did not so understand their engagement, their mistake is chargeable to their own inattention and not to the bank.

We are now brought to inquire whether any defalcations have occurred, and if so, to what amount, within the period of the sureties' liability under these bonds. * * †

II. We now come to the second general ground of relief taken for the sureties, which, is that the board of directors of the branch bank neglected to supervise the accounts of the bank, and to count its cash funds with such care and frequency as would have led to the speedy detection of any irregularity or fraud, and so would have guarded both the bank and the cashier's sureties against loss. Having, as is allged, failed to do so, it is urged that they are equitably estopped from throwing upon the sureties a loss which but for their own neglect would not have occurred.

This defense assumes as its basis, that diligence on the part of the bank—some degree of watchfulness over the cashier, his transactions and accounts, was a duty on the part of the directors—a duty not simply to the bank, whose agents they were, but to these sureties—the performance of which was a condition to the right of the bank

---

†The discussion of the evidence is omitted, being unnecessary to a full understanding to the decision of the legal points involved, and the result of the inquiry sufficiently appearing from the conclusion reached.

to hold them liable. But whence, it must be asked, arises any such duty on the part of the bank *towards the sureties ?* Clearly not out of the terms of the bond, for by these the sureties undertake for Heston's good behavior without any qualification—in effect, therefore, undertaking absolutely and at all events. Nor does there appear to have been any collateral engagement on the part of the directors, or representations made to the sureties before they entered, that any supervision would be exercised by the directors. Though the existence of a by-law directing a periodical examination of accounts and count of funds is alleged in the bill, there was none such in fact. On the contrary, the by-laws in force since 1835 charge *upon the cashier alone* the entire responsibility for the correctness of all accounts and the safety of the funds. We cannot then consider, in order to bring the sureties under the protection of the doctrine of equitable estoppel, that they entered into these bonds upon the faith of a by-law or regulation requiring a supervision of the cashier, or of some engagement or representation on the part of the bank that such supervision would be exercised. As the case presents itself, the sureties appear to have undertaken for Heston relying on his integrity rather than upon the bank's watchfulness, and submitting themselves to whatever may be the legal responsibility of sureties, without seeking to qualify it in their own case by any special conditions. Then it only remains to add, that under those rules of law, which, in the absence of express stipulation, fix the responsibilities of sureties, *it is good faith and not diligence which is required of the creditor as a condition of his right to hold the surety.* Connivance on his part at the fraud of the principal, discharges the sureties. But the creditor, or the obligee in a bond, is not obliged, for the benefit of sureties, to watch the principal. It is because it is really impracticable for this to be done effectually and at all times, on the part of large institutions, that official bonds are required. To subject the responsi-

bility of sureties to so indefinite a question, as whether due diligence has been exercised by directors, would render these securities worthless.    To their value and usefulness, it is essential that the obligations assumed should be certain and absolute.

This distinction between the effect of *fraud* and of *laches only* on the part of a creditor or obligee upon the liability of sureties is clearly put in the *United States vs. Kirkpatrick*, 9 *Wheat.*, 720.    That was an action upon an official bond taken by the United States Government. The defense was neglect on the part of the collecting officer of the Government to sue within the time prescribed by law.    The Court, reasoning from what it considered an undisputed rule in suretyships between private parties, says "it is admitted that *mere laches without fraud* forms "no discharge of a contract of this nature, between private "individuals.    Such is the clear result of authorities."    The same distinction has been applied to the case of sureties in a cashier's official bond in *The State Bank vs. Chetwood*, 3 *Halst.*, 1, and in *Taylor vs. Bank of Kentucky*, 2 *J. J. Marshall* 565.

There is another principle quite well adjudged, which is equally decisive against this defense of the sureties.    It is this :—The obligation of the sureties being to the corporation, *i. e.*, to the stockholders by their corporate name, is not affected by the acts or omissions of the directors of the branch bank, who are themselves but servants of the corporation, and who, though they exercise many important corporate powers, have not authority to compromise or impair the official securities of the corporation.    This has been decided in two cases where the directors, whose acts were called in question by sureties, were directors of the bank to which the official bond was given, and not of a branch bank.    *Minor vs. The Mechanics' Bank of Alexandria*, 1 *Peters*, 46 ; *Amherst Bank vs. Root*, 2 *Metcalf*, 522.    In another case, quite like the present one, this

principle was applied with the more force where the official bond was given to the Bank of Kentucky, a parent bank, by the cashier of one of its branches, and the defense was that the directors of the branch bank had knowledge of the cashier's delinquencies and connived at them.  The defense was held insufficient.  *Taylor vs. The Bank of Kentucky, 2 J. J. Marshall,* 565.  These cases go so far as to hold that even a fraudulent combination between the directors and cashier does not discharge the cashier's sureties from their responsibility to the stockholders, who are the corporation.   It is difficult to see how this conclusion can be avoided, but the question does not arise here.

III.  There remains a third and last ground of relief taken for the sureties—that is, that under the Statute barring suits on official bonds after two years from the accruing of the cause of action, the sureties are discharged as to so much of the defalcation as occurred more than two years' previous to the entering of judgment on the bonds, which was in March, 1867.  It will be observed here, that two of the memorandum checks, amounting together to $6,088 44, bear date, one, September 5, 1866, the other, January 15, 1867, both within two years next before the entering of judgment on the bonds.  We have seen that the defalcations represented by these checks respectively, must, in the absence of evidence to the contrary, be taken to have been committed at the date of the checks, and to these, therefore, the statutory bar can have no  application.

We then take up the check of December 1, 1864, for $3046.46.   This sum was abstracted more than two years before the judgments were entered.  Should the bank, on that ground, be restrained from collecting this amount ? I here pass by one of the questions raised in the argument, viz. :   Whether Heston's failure, on March 2 , 1867, when his defalcation was discoverd, to pay over the sums he had taken, was of itself a new breach of his official bond

which gave the bank two years from that date within which to proceed on the bond for any defalcation committed while it was in force. It is not necessary to decide that question ; for even supposing the abstraction of of $3,046 46 on December 1, 1864, to be the only breach of the bond as to that sum, still the bank is entitled to collect it. *Their equity to do so arises out of the fact that the defalcation was a fraud concealed from the bank, with respect to which a court of equity will not permit the statutory bar to be set up until the lapse of the prescribed term after discovery of the fraud.*

It is a settled and familiar principle that a court of equity will not permit a party to make an unconscientious use of an advantage gained at law. Hence it will deprive him of defenses when set up to protect fraud though such defenses be founded upon the most positive statutory enactments.

A familiar instance of this jurisdiction arises out of the Statute of Frauds. Although this statute was intended absolutely to avoid parol contracts for interests in land, courts of equity do not allow an unconscientious use of it, and, therefore, it is that if a party has in part performed a parol contract for the sale of lands, the statute shall not be set up against a bill seeking a complete performance. This court has long exercised the same power to restrain an unconscientious use of the Statute of limitations. A very able vindication of this power, and one now received as authoritative, is by Lord Redesdale in *Bond vs. Hopkins*, 1 *Sch. and Lef.*, 431. The adjudged cases afford many illustrations of the doctrine. In *Putney vs. Warren*, 6 *Ves.*, 73, it was applied by Lord Eldon to protect a party who had been prevented from pressing his remedy at law by his adversary's carrying on an unfounded litigation in equity until the statute had run. So in some cases where through mistake a party has omitted to prosecute his rights in time, equity has relieved against the statute, as
39

---

---

in *Brookshanks vs. Smith, 2 Younge and Coll.*, 68. But most especially does equity relieve against any attempt to use the statute as a cover for fraud. In such case this court will even interfere in an action at law to restrain a defendant from pleading the statute ; *a fortiori* will it refuse in the furtherance of fraud, to enforce the statute by it own decree in a case which, like this, is one of equitable jurisdiction. It treats the statute as running *from the discovery of the fraud*, not before. There has been controversy whether *courts of law* can afford this relief against the statute, but none whatever as to the power of a court of equity : 2 *Sto. Eq. Jur.*, 1521,1521 *a* ; *South Sea Co.vs.Wymondsell* 3 *P. Wms.*, 143 ; *Deloraine vs. Browne.* 3 *Bro. C. C.*, 363 ; *Booth vs. Ld. Warrington*, 4 *Bro. P. C.*, 163.

There is nothing in the present case to except it from the operation of the rule. It is true that equity will not relieve against the bar of the statute in favor of a party who has been in *laches* in not using means within his power to discover the fraud. But a close supervision by large moneyed corporations over their officers, sufficient to ensure the speedy detection of fraud, is not practicable, and were it so, would become intolerable. These institutions must unavoidably trust their officers and rest upon the official bond as the guaranty for their fidelity. It is to this end that the bonds are taken. Their value would be destroyed and their purpose defeated were it in the power of a shrewd cashier to absolve himself and his sureties by covering up his frauds for two years.

If the rules applied to this case seem to bear hardly upon the sureties; it must be remembered that by these bonds they undertook for the cashier's fidelity, absolutely and at all events, and engaged unconditionally to make good his defaults. They had the power to limit their responsibility expressly to one year, or to make it subject to any conditions which might be agreed upon. But this

was not done.  It would be a prudent  practice and  one best securing all parties, that the obligation of such bonds be expressly limited to one year, and that upon the giving of a new bond by an officer re-elected, an examination be made sufficient to test his integrity at that time.

A decree will be entered  dissolving the injunction so far as to allow the bank  to collect the amount of  the defalcations proved, with interest.