USCA1 Opinion

 

 UNITED STATES COURT OF APPEALS FOR THE FIRST CIRCUIT ____________________ No. 96-1730 EARL O. BERGERSEN and EVELYN K. BERGERSEN, Petitioners, v. COMMISSIONER OF INTERNAL REVENUE, Respondent. ____________________ APPEAL FROM A DECISION OF THE UNITED STATES TAX COURT [Hon. Edna G. Parker, Judge] _____ ____________________ Before Selya, Circuit Judge, _____________ Bownes, Senior Circuit Judge, ____________________ and Boudin, Circuit Judge.  _____________ ____________________ James M. O'Brien with whom Baker & McKenzie was on briefs for ________________ _________________ petitioners. Jonathan S. Cohen with whom Loretta C. Argrett, Assistant ___________________ ____________________ Attorney General, and Frank P. Cihlar, Tax Division, Department of ________________ Justice, were on brief for respondent. ____________________ March 21, 1997 ____________________ BOUDIN, Circuit Judge. This appeal involves a tax ______________ dispute posing two questions: whether certain payments to the taxpayers by a controlled company were constructive dividends (rather than loans) and whether the taxpayers were residents of Illinois (rather than Puerto Rico) in 1986 and 1987. The Tax Court answered yes to both questions, resulting in adverse consequences for the taxpayers, who now appeal. We affirm the Tax Court. The basic facts, derived from the record and the Tax Court findings, are largely undisputed, although the inferences and conclusions to be drawn are very much in dispute. The taxpayers are Earl and Evelyn Bergersen, a long-married couple who resided for many years in Illinois. Earl Bergersen practiced as an orthodontist in Winnetka, Illinois, starting in 1959. In addition to practice and part-time teaching, Earl Bergersen invented and patented new orthodontic products, which enjoyed a good deal of success.  In the early 1970s, the Bergersens incorporated Ortho- Tain, Inc., under Delaware law, to manufacture and sell products based upon Earl Bergersen's inventions. At all times pertinent, the couple were the only members of the Ortho-Tain board of directors. During the tax years at issue in this case (1985-1987), the Bergersens also held all of the class A voting shares in the company (56 each), with five class B voting shares held by each of their three children. -2- -2- Each of the children also held between 100 and 300 shares of class C nonvoting stock. Santos Ortiz, manager of the company's Puerto Rico plant, held 200 shares of class D nonvoting stock, and Thomas Sedwick, the tool and die maker at the plant, held 190 shares of class E nonvoting stock. Initially based in Winnetka, the plant was moved to Puerto Rico in 1976. The Bergersens hoped to move to Puerto Rico eventually; residents of Puerto Rico are exempt from U.S. income tax on income derived from Puerto Rico sources. 26 U.S.C. 933. After the plant moved, Ortho-Tain elected to be treated as a possessions corporation, exempting it from U.S. income tax on Puerto Rico source income. Id. 936. ___ The company also received a 15-year industrial tax exemption from Puerto Rico, which also permitted Puerto Rico residents to receive company dividends free of income tax. See 13 ___ L.P.R.A. 252 et seq.; id. 252b(a)(1). _______ ___ During the late 1970s, Ortiz and Sedwick ran the Puerto Rico plant while the Bergersens handled the company's finances from Illinois. Ortho-Tain's sales grew from $600,000 in 1977 to $1.2 million in 1987. During these years, the taxpayers received no salary from the company, and no dividends were declared on their stock until 1987. During most of the period, modest dividends (ranging from $5,000 to around $22,000) were paid annually to Ortiz and to Sedwick. -3- -3- In this same period, Ortho-Tain's accumulated undistributed earnings grew from just under $350,000 in 1977 to just over $5 million in 1986. The company's possession status freed it from the U.S. accumulated earnings tax. 26 U.S.C. 936(g). Meanwhile, starting in 1982, Earl Bergersen borrowed substantial amounts from the company, totaling almost $3,700,000 by 1987. The loans were evidenced by unsecured demand notes and carried interest rates of 8.5 to 10 percent; the taxpayers regularly paid this interest to the company and deducted the interest payments on their U.S. income tax returns for the years 1982 through 1986. Apart from one loan repayment of about $400,000 in 1984, the loans were carried on Ortho-Tain's books until March 1987, when Ortho-Tain issued dividends of about $2,800,000 to the taxpayers, which they treated as exempt from U.S. income tax under section 933 and immediately paid back to the company to reduce their outstanding loans. The remaining loan balance was repaid after further dividends of just over $2,000,000 to taxpayers in 1988. As one might guess, it is the position of the Internal Revenue Service that the loans were constructive dividends subject to U.S. income tax when made. The other issue in dispute concerns the timing of the Bergersens' move to Puerto Rico. Looking toward this move, they purchased land in Puerto Rico in 1981 and, over the next -4- -4- several years, planned an elaborate house. Construction began in 1984 but, because of delays, the house was not finished as expected by late 1985. In the meantime, starting in 1984, Earl Bergersen turned over much of his orthodontics practice to another dentist and spent only a few days a month with established patients. In July 1985, the Bergersens sold their Winnetka house and in September 1985 agreed to buy a town house in Glenview, Illinois. In April 1986, they joined a Glenview social club. They also sublet an apartment in Puerto Rico from their employee Sedwick from November 1985 through October 1986. When the sale closed on the Winnetka house in November 1985, the Bergersens dispersed their belongings to various places in Illinois and Puerto Rico. By summer 1986, the Bergersens' new Puerto Rico house had one bedroom finished, which they used on occasion, and they installed a housekeeper couple in the house. More of their furnishings were shipped there in August 1986. At about the same time, the Bergersens shipped a car to Puerto Rico, registered it, and activated a country club membership there. They obtained an occupancy permit for the new house in January 1987, but construction continued until August 1987.  During 1986 and 1987, the Bergersens traveled a good deal for both business and pleasure, dividing their time -5- -5- between Puerto Rico and the United States mainland. They spent 108 days in Puerto Rico in 1986 and 93 there in 1987. They spent 107 days in the Glenview town house in 1986 and 138 days there in 1987. Thus, in 1986, they spent 150 days in places other than Illinois and Puerto Rico; in 1987, the figure was 134 days. Earl Bergersen spent no more than a few weeks each year seeing patients in Winnetka. In February 1987, the Bergersens replaced Illinois drivers' licenses that they had lost. In August 1987, the new Puerto Rico house was completed, and the government admits that the taxpayers used it as their principal residence thereafter. Earl Bergersen wound up his Winnetka practice in late 1987. In 1988, the Bergersens acquired Puerto Rico voting cards and, in 1989, Puerto Rico drivers' licenses. The present case began after the Internal Revenue Service reviewed the taxpayers' income tax returns for 1985 through 1987. In due course, the IRS ruled that the loans made to the Bergersens in these years were not bona fide loans but constructive dividends; the result was to include the amounts received as part of the taxpayers' reportable income and to disallow deductions taken by them for interest payments on the loans.  The IRS also concluded that the Bergersens in 1986 and 1987 were not bona fide residents of Puerto Rico for the -6- -6- entire year, as they claimed, but were residents of Illinois for all of 1986 and part of 1987. It is common ground that section 933 excludes Puerto Rico source income from U.S. income tax only where the taxpayer is a resident of Puerto Rico for the entire year in question. Vazquez v. _______ Commissioner, 66 T.C.M. (CCH) 406, 407 (1993); Treas. Reg.  ____________ 1.933-1(a). Accordingly, the IRS determination meant that the moneys the Bergersens received from Ortho-Tain in those years were not excludable from U.S. income tax under section 933.  The Bergersens petitioned the Tax Court to redetermine various disputed issues pertaining to their returns. 26 U.S.C. 6213. The case was tried before the Tax Court in April 1994. In August 1995, the Tax Court issued a 66-page decision, resolving a number of issues including the two now presented on appeal. On those two issues, the Tax Court held that the loans were constructive dividends and that the Bergersens were not residents of Puerto Rico for the entire year either in 1986 or 1987. Bergersen v. Commissioner, 70 _________ ____________ T.C.M. (CCH) 568, 588 (1995). This appeal followed. The Loan or Dividend Issue. The loan or dividend _____________________________ issue, which is not uncommon in tax cases involving controlled companies, usually poses the question whether the owner is trying to smuggle earnings out of the company without paying personal income tax. A dividend or salary -7- -7- paid to an owner is taxable as income; a loan, being only a temporary transfer, is not. But if a "loan" by the company to an owner is not intended to be repaid, then allowing that label to control would effectively deprive the government of its tax bite on dividends and salaries.  The conventional test is to ask whether, at the time of the withdrawal in question, the parties actually intended repayment. Crowley v. Commissioner, 962 F.2d 1077, 1079 (1st _______ ____________ Cir. 1992). Explaining that "intent" is difficult to discern, courts regularly resort to objective criteria, asking whether the transaction bears the traditional hallmarks of a loan or of a dividend. Id. In any event, ___ purporting to be looking at intent, appeals courts generally describe such intent as a fact, id. at 1080, and subject the ___ fact-finder's determination to clear error review, see id.; ___ ___ see also Commissioner v. Duberstein, 363 U.S. 278, 290-91 _________ ____________ __________ (1960). Here, the government invokes this deferential standard of review. It argues that the finding of constructive dividends cannot be clearly erroneous in light of the various indicia mentioned by the Tax Court as suggesting dividend status: that the loans had no collateral and no fixed repayment schedule; that no limits were set on the amounts to be borrowed; that the proceeds were used by the Bergersens for personal purposes; and that Ortho-Tain accumulated huge -8- -8- earnings but paid the Bergersens no dividends during the years of the loans until 1987.  The Bergersens, on the other hand, say that the Tax Court made an error of law by stressing that the Bergersens were trying to "avoid taxes" by delaying dividends until they moved to Puerto Rico; Congress, the Bergersens point out, chose in section 936(g) to allow possessions companies to accumulate earnings in Puerto Rico and to distribute the amounts free of U.S. income tax to those who have moved there. And the Bergersens dispute the government's portrayal and weighing of the objective factors. Like white asparagus or a blood orange, this first issue is not ordinary fare but an odd variation, caused by the interplay of ordinary factors with Puerto Rico tax status. The Bergersens may well have intended to repay the loans after they moved to Puerto Rico. After all, at that point they could do so by declaring a dividend to themselves free of U.S. (and Puerto Rico) income tax; and after using the dividends to repay the loans, they remained free to use the repaid funds for a new dividend, again without U.S. (or local) tax consequences. The situation is thus very different from the ordinary loan-or-dividend case, where repayment of the loan to the company would effectively preclude a tax-free distribution. Here, the Bergersens could reasonably have intended to repay -9- -9- the money and reap the benefits of a tax-free distribution. ___ Nor would there have been anything wrong if the Bergersens, knowing that they were moving eventually to Puerto Rico, had accumulated earnings in the company but refrained from withdrawing them until after the move. The question here, then, is whether the Bergersens could pay out moneys to themselves before moving to Puerto Rico and ______ avoid U.S. income taxes by designating the payments as loans. We think that this ought to depend upon whether, in overall character and context, the payments were more like loans or more like dividends. After all, "intent to repay" is merely a functional test that is usually suitable; but the purpose of the tax law is to tax transactions, not rubrics or labels. Cf. Helvering v. Gregory, 69 F.2d 809, 810 (2d Cir. 1934), ___ _________ _______ aff'd, 293 U.S. 465 (1935). _____ Here, the payments had some of the traditional indicia of loans (notes existed, interest was paid). In other respects, formalities were absent (no fixed repayment date, no collateral, no credit limit). But regardless of formalities, the nominal loans, paid by a controlled company that was accumulating large earnings but paying its main owners no dividends, effectively gave the Bergersens permanent tax-free control over the moneys. _________ If after their move, the Bergersens had decided not to repay but to cancel the loans as a form of dividend, there -10- -10- would have been no tax due on this dividend. If instead--as actually happened--they declared cash dividends and repaid the loans, the effect was to redeposit the money in their own corporate vehicle, available for redistribution to them at any time, again with no tax consequences. As the Tax Court observed, the repayment was effectively a "meaningless exchange of checks." Bergersen, 70 T.C.M. at 585-86. _________ Indeed, even the earlier interest payments could be recovered by the Bergersens without tax effects. Thus, at the very outset of the loans, the Bergersens knew that there was no effective corporate constraint to induce repayment, nor (given the intended move to Puerto Rico) any meaningful tax consequences from a permanent failure to repay. An effective permanent transfer of corporate funds to an owner is the hallmark of a dividend or a salary, and not a loan. There is nothing wrong with an owner making such a transfer. But when made to a U.S. mainland resident, the transfer is subject to U.S. income tax.1  ____________________ 1Nor does it matter that the Bergersens might have achieved their ends through a different device, say, by borrowing the money from a bank--a real loan requiring repayment--and repaying it with a tax-free dividend declared after the move to Puerto Rico. The taxpayers are stuck with the transaction they chose to employ. See Commissioner v. ___ ____________ National Alfalfa Dehydrating & Milling Co., 417 U.S. 134, _____________________________________________ 148-49 (1974). -11- -11- Looking through form to substance, see Commissioner v. ___ ____________ Court Holding Co., 324 U.S. 331, 333-34 (1945), we reach the __________________ same result as the Tax Court and therefore need not concern ourselves on this issue with the proper standard of review (since even de novo review would lead to affirmance). The _______ claim that the Tax Court made a mistake of law in construing section 933 without giving sufficient consideration to section 936(g) is a red herring. Congress' policy permitted the company to accumulate earnings in Puerto Rico free of tax; it did not authorize tax-free dividends to Illinois residents. The Residence Issue. We turn now to a more conventional ____________________ issue, namely, whether the Bergersens were residents of Illinois during 1986 and at least part of 1987, as the Tax Court ruled, or whether they were residents of Puerto Rico for either or both years in their entirety. Determining residence can present distinctive issues either of law or fact; but quite commonly in the end the question--often called a "mixed question of law and fact"--turns on applying a legal label, refracted into a set of legal criteria, to a unique set of facts. That is so here. "Mixed question" is something of a misnomer; once the raw facts are determined (and such determinations are normally reviewed only for clear error), deciding which legal label to apply to those facts is a normative decision-- -12- -12- strictly speaking, a legal issue. United States v. McConney, _____________ ________ 728 F.2d 1195, 1202 (9th Cir.) (en banc), cert. denied, 469 _______ _____________ U.S. 824 (1984). But a fact-finder closer to the evidence may still have a superior "feel"; and the value of precedent is limited, since the next shake of the kaleidoscope will produce a different fact pattern.  We think that a mixed question of fact and law is presented in this case, and that some deference should be afforded to the Tax Court's ultimate determination. Johnson _______ v. Watts Regulator Co., 63 F.3d 1129, 1132 ((1st Cir. 1995). ___________________ See generally 9A C. Wright & A. Miller, Federal Practice and ______________ ____________________ Procedure 2589 (1995 & Supp. 1996). In certain narrow _________ situations involving residency, subjective intent may be very important, and review limited to clear error. Cf. Treas. ___ Reg. 1.871-3, 1.871-4(c) (residency of alien seamen). But the ordinary case presenting the residency question, which arises under several tax code provisions,2 is decided by using largely objective criteria, developed in the decisions. E.g., Sochurek v. Commissioner, 300 F.2d 34, 38 (7th Cir. ____ ________ ____________ 1962). These laundry lists have to be used with some caution because they are framed broadly, to cover disparate problems. Deciding when the Bergersens became bona fide "residents" of  ____________________ 2See, e.g., 26 U.S.C. 871 (nonresident aliens); id.  _________ ___ 911 (foreign earned income exclusion for U.S. citizens residing abroad); id. 933 (Puerto Rico residents). ___ -13- -13- Puerto Rico is somewhat different from determining, albeit for U.S. tax purposes, when an American airline pilot based abroad is a "resident" of Japan, or a visiting French consultant is a "resident" of New York. Cf. Jones v. ___ _____ Commissioner, 927 F.2d 849, 855-57 (5th Cir. 1991); Friedman ____________ ________ v. Commissioner, 37 T.C. 539, 551 (1961). ____________ But in all three situations, "residence" implies that the individual has established his or her residential base, planning to remain indefinitely or at least for a substantial period. See Treas. Reg. 1.871-2(b). Clearly the ___ Bergersens did intend eventually to base themselves and remain permanently in Puerto Rico; that is why they embarked on construction of a very expensive house in 1984, before the ______ tax years in dispute. The question for us, as we see it, is when the Bergersens had effectively moved their base to Puerto Rico and established their residence there. As the Tax Court candidly said, the Bergersens' conduct amounts to a move to Puerto Rico carried out over a period of time. Bergersen, 70 T.C.M. at 582. Here, some of the _________ conduct was completed by 1986. Prior to 1986 they had moved some furnishings to Puerto Rico and rented an apartment. In 1986, they began to use portions of their partly completed house, installed a housekeeper couple, activated a club membership in Puerto Rico, and shipped over a car and some -14- -14- remaining furnishings. Apparently they also spent Christmas there in 1986. But the links with Illinois extended into 1987. The Bergersens continued to use their Glenview house in 1987, spending 138 days there in that year and only 93 in Puerto Rico. They maintained Illinois drivers' licenses, and Earl Bergersen still did occasional work in his Winnetka office. The Puerto Rico house was not fully completed until August 1987, and the Bergersens did not register to vote in Puerto Rico or get drivers' licenses there until 1988 and 1989, respectively. We agree with the Tax Court that for 1986 and at least part of 1987, the Bergersens were residents of Illinois and not yet of Puerto Rico. No one consideration is decisive: the center of gravity was shifting from Illinois to Puerto Rico throughout the period. But taking account of all of the ties to both places, the Tax Court's conclusion seems to us not only reasonable but right. While we would ordinarily give some weight to its view in applying a tax code concept to specific facts, see, e.g., Manzoli v. Commissioner, 904 ___ ____ _______ ____________ F.3d 101, 103 (1st Cir. 1990), we would reach the same result here even if review were de novo. _______ The Bergersens imply that the Tax Court erred as a matter of law by giving weight, in deciding the residency issue, to an alleged tax avoidance motive. The Tax Court -15- -15- made one reference to tax avoidance as a relevant concern (the other reference was to an argument by the government). Bergersen, 70 T.C.M. at 581, 583. But in the very same _________ passage, the Tax Court made clear that it was the time of the move to Puerto Rico, judged by objective factors, that was decisive. We reach the same result, giving no weight to the alleged motive. A tax avoidance motive is often included in the laundry list of factors bearing on bona fide residency, see, e.g., _________ Sochurek, 300 F.2d at 38, so it is not surprising that the ________ Tax Court mentioned it in passing. But the Bergersens were perfectly free to consider tax advantages in moving their residence to Puerto Rico, and here we think that tax motives provide little help in determining when this move occurred. (A tax motive does, however, help explain why the payments were structured as loans.) The balance of the Bergersens' argument on the residency issue is an effort to stress factors favorable to an early residence in Puerto Rico (e.g., that work on the house was ____ largely completed in 1986) and to explain away some of the factors pointing to Illinois (e.g., the retention of Illinois ____ drivers' licenses). The arguments are perfectly legitimate and well presented. They serve to explain why the case is a close one on the issue of residency at least as to 1987. -16- -16- But a number of important considerations--such as the purchase and maintenance of the house in Glenview and the time spent in Illinois in 1987--cannot be minimized. And even if small adjustments are made in other elements, the overall balance still seems to us to favor the government. When dealing with incommensurable factors, it is often hard to do more than fairly array the factors on both sides, as we have done in summary and the Tax Court in detail, and then state the result. Because the Bergersens were not bona fide residents of Puerto Rico either in 1986 or for the full year in 1987, they were not entitled to avoid U.S. income tax on Puerto Rico source income in those years. 26 U.S.C. 933. As the "loans" were constructive dividends, they were taxable income to the Bergersens when made, and the Bergersens were not entitled to deduct the interest payments to the company. See ___ Knetsch v. United States, 364 U.S. 361, 365-66 (1960). _______ _____________ Affirmed. _________ -17- -17-