# United States Court of Appeals
## For the First Circuit

No. 01-1153

NORMA J. NIEHOFF, ET AL.,
Plaintiffs, Appellees,

v.

KENNETH L. MAYNARD AND LONG RIDGE ASSOCIATES L.P.,
Defendants, Appellants.

No. 01-1154

NORMA J. NIEHOFF, ET AL.,
Plaintiffs, Appellants,

v.

KENNETH L. MAYNARD AND LONG RIDGE ASSOCIATES L.P.,
Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
[Hon. Mary M. Lisi, U.S. District Judge.]

Before

Selya, Circuit Judge,
Stahl, Senior Circuit Judge, and
Lipez, Circuit Judge.

Marcus E. Cohn, with whom Leigh-Ann M. Patterson, Nixon Peabody LLP, W. Mark Russo, and Ferrucci Russo P.C. were on brief, for defendants.
Robert D. Fine, with whom Annie Talbot and Chace Ruttenberg & Freedman, LLP were on brief, for plaintiffs.

August 9, 2002

**STAHL**, **Senior Circuit Judge**.    Defendant Kenneth L. Maynard appeals from the decision of the district court that the claims of seven plaintiff-investors, which would otherwise be time-barred, were still viable due to tolling of the statute of limitations.  After a thorough review of the record, we affirm.

I.

After a three-day bench trial, the district court found that Maynard breached the limited partnership agreement between him and the seven plaintiffs and breached his fiduciary obligations to them, and awarded each of the plaintiffs damages commensurate with their original investment.  The court denied, however, the plaintiffs' request for punitive damages.  On appeal, Maynard does not challenge the court's findings of liability.  Rather, he insists only that the court erred in rejecting his statute of limitations defense.  For their part, the plaintiffs appeal from the denial of punitive damages.  In order to comprehend fully the issues raised by these appeals, we recount the factual background as developed in the record of the proceedings below.

In October 1987, Maynard purchased 178.8 acres of land in Charlestown, Rhode Island (Property).  In 1988, Maynard formed a limited partnership to develop townhouse condominiums on the Property.  The partnership, which was called Long Ridge Associates Limited Partnership (Partnership), was formed under Delaware law. The partnership agreement (Partnership Agreement) designated Maynard as the general partner and provided that he would turn over

-2-

to the Partnership his interest in the Property, to which he assigned a value of $1.8 million.

Maynard decided to issue a private offering to solicit investments to fund construction of the condominiums. To that end, he distributed a Private Offering Memorandum (POM) in or about December 1988 with details about the construction of an 89-unit townhouse development on the Property (Project). The partnership was structured so that an investor could become a limited partner by subscribing to a "limited partnership unit," or a portion thereof. The POM stated that eighteen limited partnership units were being offered at a price of $100,000 per unit. According to the POM, however, the offering was made on an all-or-nothing basis, meaning that the deal would go through only if all eighteen units were subscribed by November 1, 1989.[1] Therefore, unless all eighteen units were sold by November 1, 1989, the offering was to be withdrawn and the money refunded to the investors.

The POM obligated Maynard to hold the proceeds from the offering until the partnership was fully subscribed.[2] In addition,

---

[1] The POM stated in relevant part:

> This offering will be withdrawn if the Partnership has not received subscriptions for all of the Units on or before March 1, 1989, unless extended by the General Partner to a date not later than November 1, 1989, at which time the General Partner will have the option to acquire all (but not less than all) unsold Units on the same terms and conditions as such Units are offered hereby.

[2] Specifically, the POM provided:

> The proceeds of the offering will be received

-3-

the Partnership Agreement required Maynard to provide the limited partners with financial disclosures on an annual basis, including a balance sheet, profit and loss statement, and a statement showing Partner distributions.  The Partnership Agreement further required that "all of the books of account of the Partnership . . . at all times be maintained at the principal office of the Partnership" and "be open to the inspection and examination" of the limited partners.

The plaintiffs - Norma J. Niehoff, Arlene Klughart, A. Stephen Melcher, Lee Frascino, Victor J. and Roseanna Cubelli Melone, and John Canzanella - are limited partners in the Partnership.[3]  All had prior investment experience, and at least three of them -- Victor Melone, Norma Niehoff and Lee Frascino -- had invested previously with Maynard in connection with various New

---

and held for the benefit of investors in the offering and will be retained after closing to be used only for the purposes set forth herein under the caption "Use of Proceeds".  In the event the offering is not completed or if the transactions referred to herein are not consummated for any reason, then all subscription payments will be refunded to subscribers without interest and without deduction.

[3] As a prerequisite to investing in the Partnership, individuals had to possess a certain level of sophistication and experience in financial matters. Specifically, the POM provided that "subscriptions to the Partnership are being offered on a private basis to persons who it is believed prior to any sale have such knowledge and experience in financial and business matters that they are capable of evaluating the merits and risks of the investment."  The parties agree that the plaintiffs satisfied this requirement.

York-based real estate limited partnerships during the mid-1980s, which had apparently been successful ventures.

Canzanella was the first to invest in the Partnership in October 1988, followed by Niehoff, the Melones and Melcher in November 1988. Frascino invested in February 1989. As of November 1, 1989, the subscription deadline, only 6.4 of the eighteen units had been sold. Subsequently, Klughart invested in February 1990, bringing the aggregate of the plaintiffs' investment to 6.9 of the eighteen units of the Limited Partnership.

Although Maynard was obligated under the POM to refund the plaintiffs' money because the partnership was not fully subscribed by the November 1, 1989 subscription deadline, he failed to do so. Instead, in March 1990, Maynard subscribed to the remaining 11.1 unsold units himself and executed a Limited Partner Signature Page, which bound him to "all of the terms of the Limited Partnership Agreement of Long Ridge Associates," including a provision that "[p]ayment for each Unit shall be made in cash." As payment for these 11.1 units, Maynard paid via paper transfer $500,000 (which was due him from the Partnership for the Property) and, notwithstanding his obligation to make a cash payment, executed a promissory note for the remaining $610,000. None of Maynard's machinations were revealed contemporaneously to the plaintiffs.

In March 1990, Maynard failed to deliver any financial reports to the limited partners, contrary to his contractual duty to do so by that date. On December 14, 1990, Melone sent a letter

to Maynard inquiring about the status of the investment and suggesting that the provision of such information was "most overdue." Despite Melone's request, Maynard did not send out any financial reports at that time.

Throughout the latter part of 1990 and into the early part of 1991, several plaintiffs made telephone calls to Maynard, seeking information about the status of the Project. Maynard explained to them that the Project was "construction-ready," but that there had been delays because of the regulatory approval process and a lawsuit brought by the Narragansett Indian tribe.

On February 28, 1991, Maynard sent an eighteen-page letter to the plaintiffs to "report on the current status of the Long Ridge Townhouse project and to describe the events that have brought us to the current point." In this letter, Maynard informed plaintiffs that construction of the townhouses had not yet begun. Maynard explained this delay by recounting the progress on various preliminaries, including the permitting process and the surveying, engineering and land planning work. In addition, he described the particulars of a lawsuit brought by the Narragansett Indians against Maynard to block the Project. He also attributed the delays to a depressed real estate market and the resulting difficulty in obtaining a construction loan. As to financial matters, Maynard reassured the plaintiffs that the equity in the Project, including land and development expenses, stood at approximately $3.0 million. He stated that, while he was "looking aggressively for a way to make something happen," he insisted that

he was "not going to take action that would jeopardize this equity, part of which secure[d] [the plaintiffs'] investment."

In 1993, Niehoff paid a visit to Maynard at his home in Charlestown, the principal place of business of the Partnership and the site of its books. Niehoff asserts that she went there specifically to examine the financial statements; however, Maynard told her the statements would not be ready until December 1993 and that he would send them to her at that time. To allay her concerns, Maynard took Niehoff to visit the project site.

Despite his promises, Maynard failed to send Niehoff any financial reports in December 1993. As a result, Niehoff sent a letter in January 1994 expressing her desire to extract her investment from the Partnership and communicating her frustration with the lack of financial information provided to the limited partners. In this letter, she emphasized that she found Maynard's "casual approach to the considerable sums of money placed in good faith with [him] very disconcerting." Further, she told him that she was "shocked" that he had not followed up on his promise to send formal financial reports and claimed that "this extended blackout has exacerbated [her] concerns considerably."

The Melones likewise met with Maynard in 1993 at his home. They too expressed their concerns to him about not receiving any financial information about the Project up until that point. Maynard reassured them that he would send them the information. Once again, however, Maynard failed to follow through on this promise. In January 1994, the Melones sent Maynard a letter in

which they reiterated their concerns about the Project and expressed their frustration with Maynard's apparent "disregard . . . for the money entrusted to [him]." They indicated that they were "amazed" that Maynard thought that investors such as themselves, with a combined exposure of $200,000, would be "complacent." In the face of Maynard's "cavalier" attitude, wrote the Melones, "[t]hat can no longer be the case."

In June 1995, Maynard sent a five-page letter to plaintiffs responding to inquiries about the status of the Project. In this "report," however, Maynard failed to provide specific financials for the Project and instead stated only that, as to an estimate of the value of the investment, he believed "it appropriate to place a present value equal to your original investment." In addition, in response to the plaintiffs' inquiries, Maynard admitted at trial that he had informed at least some of them that issuing financial reports before the Partnership had started business would be "meaningless" and that financial reports would be issued only when the Partnership commenced its business of constructing and selling condominiums.

On March 31, 1998, six of the seven plaintiffs filed this diversity action against the Partnership and Maynard (in both his individual capacity and as general partner of the Partnership).[4] On August 14, 1998, the plaintiffs amended their complaint to add a seventh plaintiff, John Canzanella. In addition to seeking an

---

[4] Due to the fact that Maynard and the Partnership are for all practical purposes one and the same, we shall refer simply to Maynard when discussing the defendants.

accounting, the plaintiffs asserted four claims:  (1) breach of contract; (2) fraud and misrepresentation; (3) breach of fiduciary duty under the Limited Partnership Agreement; and (4) breach of fiduciary duty under ERISA, 29 U.S.C. § 1105.  The plaintiffs alleged, inter alia, that Maynard, in his capacity as general partner, had "diverted the funds entrusted to him by the plaintiffs for his personal purposes" and had failed and refused to "render an accounting of the finances" of the Partnership in violation of the Partnership Agreement.  They also alleged that Maynard failed "to contribute to [the Partnership] real property in Charlestown, Rhode Island," although he promised such a conveyance in 1988. Plaintiffs sought an accounting, removal of Maynard as general partner, and an immediate transfer of the Property.  In his answer, Maynard raised the statute of limitations as a defense.

During discovery, Maynard produced all of the Partnership's financial documents, books of account, and records, including copies of the Partnership's bank statements, checks and wire transfers to the Partnership by all plaintiffs, all checks written by the Partnership, documents relating to various expenditures, invoices, and contracts related to development work. According to the plaintiffs, these documents revealed to them, for the first time, the fact that (1) contrary to his contractual obligations under the POM, Maynard failed to refund plaintiffs' investments in 1989 even though the offering had not been fully subscribed by the November 1, 1989 deadline set forth in the POM; (2) Maynard's March 1990 purchase of the balance of the

unsubscribed shares of the offering violated the terms of the POM; and (3) the plaintiffs' funds had been spent immediately in 1988 and 1989, rather than being held in escrow pending full subscription, as required by the POM. After these discoveries, the plaintiffs amended their complaint to "clarif[y] Count III," the breach of contract claim. The plaintiffs did not assert any new or additional causes of action, but rather sought to incorporate in their complaint the additional facts they had learned.

The parties subsequently filed cross-motions for summary judgment. The court -- adopting in part the recommendations of the magistrate judge to whom the motions had initially been referred -- entered summary judgment for Maynard on the claim for breach of fiduciary obligation under ERISA and on the claim that Maynard failed to transfer the Property to the Partnership. The court denied summary judgment on the remaining claims of diversion of funds, breach of contract, breach of fiduciary duty and an accounting, reserving these claims for trial.

A three-day bench trial commenced on December 6, 2000. At the close of the case, Maynard moved for judgment as a matter of law as to all plaintiffs and all counts arguing, inter alia, that the plaintiffs' claims were barred by the statute of limitations. The district court denied these motions. Ruling from the bench on December 14, 2000, the court awarded judgment for the plaintiffs on the claims of breach of contract and breach of fiduciary duty. With respect to the breach of contract claim, the court found that the POM was "essentially a contract between the parties," and that

-10-

Maynard breached the terms of that contract by (1) failing to purchase his 11.1 units by the November 1, 1989 subscription deadline on the same terms and conditions as those under which the plaintiffs purchased their units; and (2) by retaining the plaintiffs' funds after the subscription deadline when the Partnership was not fully subscribed.[5]  The court found that this conduct constituted wrongful self-dealing, and thus a breach of the fiduciary duty owed by Maynard to the plaintiffs pursuant to the POM.

As to the statute of limitations defense, the court identified the statute of limitations under Delaware law, which is three years.[6]  It then determined that the plaintiffs' action accrued on November 2, 1989, immediately after the subscription deadline.[7]  Because the plaintiffs' complaint was not filed until March 31, 1998 - more than eight years after the cause of action accrued - the court acknowledged that, absent tolling, their claims would be time-barred.

---

[5] With respect to Klughart, who did not invest until February 6, 1990 (i.e., after the subscription deadline), the court found that Maynard should never have accepted her money, and that, in any event, he breached his obligation to her by not refunding her money.

[6] Although the POM itself is silent as to which state's law should apply, the district court applied Delaware law pursuant to the express provisions of the Limited Partnership Agreement.  In their appeals, the parties take no issue with the district court's choice of law determination.

[7] As to Klughart's action, the court found that her claims accrued on February 6, 1990, the day that Maynard improperly accepted her investment.

After hearing all of the evidence, however, the district court concluded that the statute of limitations should be tolled until March 1999, when the plaintiffs obtained during discovery the financial documents that revealed Maynard's wrongful conduct. Thus, the district court ruled, the claims were not time-barred. In reaching this conclusion, the court found that Maynard, as a fiduciary, had been required to make timely disclosures of facts material to the plaintiffs' contractual rights and that his failure to do so constituted "misrepresentation by omission." The court also found that Maynard had engaged in fraudulent concealment by misdirecting attention away from the internal state of affairs of the Partnership to external forces that were causing delays in the Project. The court also found that Maynard had engaged in wrongful self-dealing, which the plaintiffs "did not know and could not know . . . until they made their discovery in the course of this litigation." Finally, it determined that "the plaintiffs' failure to be more aggressive in their pursuit of their claims was justified in light of the misrepresentations by omission and the misrepresentations regarding certain impediments to the viability of the partnership."

The court then awarded each plaintiff damages in the amount of his or her original investment, plus interest. It denied plaintiffs' claims for an accounting, attorneys' fees and punitive damages, finding that the plaintiffs had failed to meet their burden of demonstrating malice, which the court found to be a prerequisite for punitive damages under Delaware law. Maynard

filed an appeal attacking the judgment solely with regard to the statute of limitations issue. The plaintiffs cross-appealed, seeking punitive damages.

## II.

As a preliminary matter, we address the standard of review. A determination that equitable tolling is appropriate involves a mixed question of law and fact. Under either First Circuit or Delaware law, a district court's ruling on a mixed question is entitled to deference to the extent that it hinges on factual determinations but must be reviewed de novo with respect to the legal standard employed. In <u>United States</u> v. <u>15 Bosworth Street</u>, 236 F.3d 50 (1st Cir. 2001), for example, this court ruled that, "[w]hen a district court conducts a bench trial, its legal determinations engender de novo review. . . . In contrast, the court's factual findings are entitled to considerable deference." <u>Id.</u> at 53 (citations omitted). However, "when a trial court bases its findings of fact on an inaccurate appraisal of controlling legal principles, the rationale for deference evaporates entirely." <u>Id.</u> at 54.

Similarly, in <u>Bergersen</u> v. <u>Commissioner</u>, 109 F.3d 56, 61 (1st Cir. 1997), we observed that the term "'mixed question' is something of a misnomer; once the raw facts are determined (and such determinations are normally reviewed only for clear error), deciding which legal label to apply to those facts is a normative issue -- strictly speaking, a legal issue." Even with that said, however, we recognized that "the fact-finder closer to the evidence

-13-

may still have a superior 'feel'; and the value of precedent is limited, since the next shake of the kaleidoscope will produce a different fact pattern." Therefore, in Bergensen, the court ultimately decided that "some deference should be afforded to the [lower court's] ultimate determination" on the mixed question. Id.

The Delaware Supreme Court articulated a similar rule in Klang v. Smith's Food & Drug Ctrs., Inc., 702 A.2d 150 (Del. 1997). In that case, the court found that the question of whether a board's disclosures to shareholders were accurate was a mixed question of law and fact, "requiring an assessment of the inferences a reasonable shareholder would draw and the significance of those inferences to the individual shareholder." Id. at 156. In such cases, "[i]f the trial court's findings are sufficiently supported by the record and are the products of an orderly and logical deductive process, we will accept them, even though independently we might have reached an opposite conclusion." Id. at 156-57 (internal quotations omitted).

As these two standards are virtually identical from a substantive point of view, we find any choice of law question regarding the standard of review to be purely academic and unnecessary to the resolution of this case. Therefore, as we proceed to review the decision below, we will stringently examine the legal grounds upon which the district judge based her decision, but adopt a more generous view when examining her factual determinations and, assuming no legal error, the conclusions she drew therefrom.

-14-

Delaware law provides that claims for breach of fiduciary duty and breach of contract have a three year statute of limitations. See Del. Code tit. 10, § 8106. Absent concealment or fraud, a cause of action accrues at the moment of the wrongful act, even if the plaintiffs are ignorant of the wrong. See David B. Lilly Co. v. Fisher, 18 F.3d 1112, 1117 (3d Cir. 1994). The district court properly noted that under general Delaware law principles, the claims of six of the plaintiffs accrued on November 2, 1989, the date set out in the POM as the subscription deadline. As explained supra, Klughart's claim accrued on February 6, 1990. This lawsuit was not filed until 1998. Therefore, as the district court properly noted, absent tolling, the plaintiffs would be barred from recovering against Maynard.

The POM explicitly stated that Maynard was "accountable to the limited partners as a fiduciary and must exercise good faith and integrity in handling partnership affairs." Based on this provision, the district court, citing Bovay v. H.M. Byllesby & Co., 38 A.2d 808, 813 (Del. 1944), found Maynard to be a fiduciary under Delaware law, meaning that he "was under a duty to exercise the utmost good faith in his transactions with these Plaintiffs." We make a special note of this finding because Maynard's status as a fiduciary not only has consequences regarding the substantive duty owed to the plaintiffs, but also has ramifications for the tolling analysis.

In Bovay, the defendants, who were accused of enriching themselves at the expense of the company, raised a statute of limitations defense. Assessing the propriety of this defense, the Delaware Supreme Court observed:

> Sound public policy requires the acts of corporate officers and directors in dealing with the corporation to be viewed with a reasonable strictness. Where suit is brought in equity to compel them to account for loss or damage resulting to the corporation through passive neglect of duty, without more, the argument that they ought not to be deprived of the benefit of the statute of limitations is not without weight; but where they are required to answer for wrongful acts of commission by which they have enriched themselves to the injury of the corporation, a court of conscience will not regard such acts as mere torts, but as serious breaches of trust, and will point the moral and make clear the principle that corporate officers and directors, while not in strictness trustees, will, in such case, be treated as though they were in fact trustees of an express and subsisting trust, and without the protection of the statute of limitations, especially where insolvency of the corporation is the result of their wrongdoing.

Id. at 820. Relying heavily on this language, plaintiffs insist that Bovay precludes fiduciaries such as Maynard from ever defending themselves against claims of wrongful self-dealing by invoking the statute of limitations. See also Laventhol, Krekstein, Horwath & Horwath v. Tuckman, 372 A.2d 168, 170 (Del. 1976) ("In brief, the benefit of the statute of limitations will be denied to a corporate fiduciary who has engaged in fraudulent self-dealing.").

A review of Delaware jurisprudence post-Bovay indicates that the legal landscape is slightly more complicated. In one of

-16-

the first significant post-Bovay cases, Bokat v. Getty Oil Co., 262 A.2d 246 (1970), the plaintiffs had actual knowledge of all the acts allegedly giving rise to liability for more than three years before they brought their claims against the defendant. Under these circumstances, the Delaware Supreme Court ruled that the tolling principles of Bovay would not preserve their claims. Id. at 251.

A few years later, the Delaware Chancery Court explained that Bovay would only be available in limited circumstances.

> Taking Bovay and its progeny together, the rule can be summarized thus: The statute of limitations applies to derivative actions which seek recovery of damages or other essentially legal relief; however, in extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing, the benefit of the statute will be denied to those corporate officers and directors who profited personally from their misconduct.

Halpern v. Barran, 313 A.2d 139, 142 (Del. Ch. 1973). Because the plaintiffs had "not alleged that any of the individual defendants personally profited from breaches of fiduciary duty which they are said to have committed," the court ruled that "the exception to the statute of limitations expressed in Bovay does not apply to them." Id. at 143. The court then noted that fraudulent concealment could provide an independent basis for tolling the statute of limitations. Specifically, "[w]here there has been fraudulent concealment from a plaintiff, the statute is suspended only until his rights are discovered or until they could have been discovered by the exercise of reasonable diligence." Id. In order to show

-17-

fraudulent concealment, however, the Halpern court insisted that a plaintiff must demonstrate that the defendant committed an affirmative act of concealment, "some 'actual artifice' which prevents a plaintiff from gaining knowledge of the facts, or some misrepresentation which is intended to put the plaintiff off the trail of inquiry." Id. Put bluntly, a plaintiff cannot rest his case solely on his ignorance of the relevant facts.

Twenty years later, in Kahn v. Seaboard Corp., 625 A.2d 269 (Del. Ch. 1993), another Delaware Chancery Court judge rejected the notion that fraudulent concealment is the only circumstance that may toll the running of the statute, suggesting that the court "has long exercised a certain discretion in applying the statute of limitations in cases involving fraud for example, even where affirmative acts of concealment have not been alleged." Id. at 275. Rather, fraud by a fiduciary -- "one who, because he has legal power over the property of others, has fiduciary obligations to those others" -- may also provide grounds for tolling the statute of limitations. Id. at 276.

The court delineated the compelling reasons why the formula for balancing the equities must be different when the parties were previously involved in a fiduciary relationship:

> In functional terms there are good reasons why a corporate stockholder ought to be treated differently than a plaintiff who is a stranger to the defendant from whom he seeks compensation for a tort. That good reason arises out of the assigned roles of stockholder and director in our corporation law. The corporate shareholder commits capital to the supervision and management of the corporate board. In doing so the

-18-

stockholder becomes dependent upon the skill and loyalty of those in control of the corporate enterprise. Legally sanctioned relationships of dependence and trust are important for the law to enforce for both instrumental and expressive reasons. Given the fiduciary duties that the law imposes upon the relationship among those serving as corporate directors, stockholders are entitled to rely on the good faith of the directors when they act with respect to the corporation's property or processes. There is, of course, great social utility in the willingness of some to trust others in this way.

Since trust and good faith are the essence of this relationship, it would be corrosive and contradictory for the law to punish reasonable reliance on that good faith by applying the statute of limitations woodenly or automatically to alleged self-interested violations of trust. It does not, in my opinion, do so. Reasonable reliance upon the competence and good faith of others who have assumed legal responsibilities towards a plaintiff have not infrequently been held sufficient to toll the running of an applicable statute of limitations.

Id. at 275. The court also noted, albeit in a footnote, that the failure of a plaintiff to detect the existence of a claim may be excused where he or she "reasonably relies upon the competence and good faith of one with special skills or knowledge who accepts a legal responsibility towards the plaintiff," citing professional malpractice claims as an example. Id. at 275 n.5.[8]

---

[8] See also In re Dean Witter P'ship Litig., No. CIV.A. 14816, 1998 WL 442456, at *6 (Del. Ch. July 17, 1998) (noting that wrongful self-dealing may warrant equitable tolling "even in the absence of actual fraudulent concealment, where a plaintiff reasonably relies on the competence and good faith of a fiduciary") (citing Yaw v. Talley, No. CIV.A. 12882, 1994 WL 89019, at *5-*6 (Del. Ch. Mar. 7, 1994)).

The _Kahn_ court explained that, in _Bokat_, the court distinguished _Bovay_ on the ground that the _Bokat_ plaintiff had actual knowledge of the defendant's wrongdoing whereas the _Bovay_ plaintiff had been ignorant of the defendant's misconduct. Although _Bokat_'s significance originally stemmed from its decision to apply the statute of limitations to an equitable rather than a legal claim, the _Kahn_ court noted an "implicit secondary holding" of _Bokat_, which provided that "the statute does not run against the plaintiff until he or she knew or had reason to know of the facts alleged to give rise to the wrong." _Id._ at 276-77.

These cases demonstrate that Delaware courts have specified two specific sets of circumstances that can trigger equitable tolling. In the first, a fiduciary is charged with unfair self-dealing; in the second, a defendant fraudulently conceals facts that are essential to the plaintiff's cause of action. _In re MAXXAM, Inc./ Federated Dev. Shareholders Litig._, Nos. CIV.A. 12111, 12353, 1995 WL 376942, at *5 (Del. Ch. June 21, 1995). The Chancery Court's analysis in _Litman_ v. _Prudential Bache Props., Inc._, No. CIV.A. 12137, 1994 WL 30529 (Del. Ch. Jan. 14, 1994), also strongly supports the view that, while substantially similar with regard to the analysis employed, the two types of tolling are distinct:

> Plaintiffs assert that _Kahn_ stands for the proposition that when the doctrine of equitable tolling arises, no affirmative fraudulent act by the defendant need be shown. I do not read _Kahn_ quite so broadly. The facts in _Kahn_ involved a fiduciary relationship between the defendants and the plaintiffs. In addition, the plaintiffs

-20-

alleged self-dealing by the defendants. Allegations of self-dealing significantly taint the fiduciary relationship. They implicate serious breaches of loyalty and often raise the legal analysis to a higher level than ordinary breaches of care. See, e.g., In re Tri-Star Pictures, Inc., Litig., Del. Supr., Cons. C.A. No. 9577, Moore, J. (Nov. 24, 1993), Op. at 4 ("a breach of the duty of loyalty requir[es] that the defendants' actions be judged by principles of entire fairness. . . . [T]his shifts the burden to the defendants to prove 'the most scrupulous inherent fairness of the bargain'" (citations omitted)). As a result, I cannot read Kahn as holding that, in every situation in which it is implicated, the doctrine of equitable tolling will serve to toll a limitations period, regardless of whether affirmative acts of fraud by the defendants are shown. Rather, I think the better rule, and the one Chancellor Allen intended, is that a limitations period may be tolled absent allegations of affirmative acts of concealment by the defendants, where the parties to the litigation stand in a fiduciary relationship to each other and where the plaintiff alleges self-dealing. This does not take away from the fact that the doctrine of equitable tolling still acts to toll a limitations period. In situations that do not involve self-dealing, equitable tolling operates in much the same way as the doctrine of fraudulent concealment. Both theories operate to toll a limitations period when the defendant has engaged in certain acts that would prevent the plaintiff from discovering the alleged wrongs.

Id. at *3.

In this case, the district court's ruling suggests that it found both types of tolling appropriate. First, it ruled that Maynard was a fiduciary who engaged in wrongful self-dealing.[9]

_____

[9] See Cont'l Ins. Co. v. Rutledge & Co., 750 A.2d 1219, 1237 (Del. Ch. 2000) (defining wrongful self-dealing as the use of one's "position as general partner and [of one's] ability to control the terms of transactions, to invest limited partnership funds for

-21-

Under these circumstances, the court was entitled to exercise its discretion to prevent "any attempt to use the statute as a cover for fraud." Kahn, 625 A.2d at 275 (quoting Sparks v. Farmers' Bank, 3 Del. Ch. 274, 306 (1869)). Second, the district court found that Maynard fraudulently concealed information from the plaintiffs, leading them down the wrong path and delaying them from learning that their rights were in jeopardy. Tolling under the first test implicitly includes a balancing of equities. Plaintiffs can benefit from tolling until such point as other equitable considerations (in the nature of laches) preclude them from recovering. Such considerations include whether the plaintiff failed to act promptly upon learning of the fiduciary's wrongdoing and/or whether the plaintiff's failure to discover the wrongdoing was unreasonable. See In re MAXXAM, Inc., 1995 WL 376942, at *6. The second test explicitly includes a "reasonableness" prong by inquiring whether the plaintiff knew or should have known the information that the defendant was attempting to conceal. See Litman, 1994 WL 30529, at *3; see also In re Dean Witter P'ship Litig., No. CIV.A. 14816, 1998 WL 442456 (Del. Ch. July 17, 1998).

The first equitable doctrine, stemming from Bovay and as explained by the court in Halpern, suggests that, in "extraordinary cases which involve, as a minimum, allegations of fraudulent self-dealing," 313 A.2d at 142, a plaintiff who is duped by a fiduciary is given far more leeway than a plaintiff who is

_____

[one's] own gain, as opposed to investing for the benefit of the limited partnership").

-22-

victimized by someone in an arm's length transaction.[10]  If the plaintiff can demonstrate that the defendant was a fiduciary who engaged in wrongful self-dealing, the test for equitable tolling is satisfied.  The decision to toll the running of the limitations period, as well as the decision over how much tolling is equitable in any particular case, is committed, within wide limits, to the discretion of the trial judge.  In light of the policy concerns so articulately expressed in Kahn, 625 A.2d at 275, we find no error with the district court's decision to apply equitable tolling in this case.  This decision rested on factual findings that are sound and therefore falls well within the authority granted under Delaware law.  Many of the plaintiffs had invested with Maynard previously and had no reason to believe that he was pulling a scam. His representations as to the external difficulties delaying progress in the Project all were verifiable, to varying degrees, which the district court found could lead reasonable investors to believe that the asserted problems were the sole causes for the delay.  Maynard's claim that all the plaintiffs needed to do was ask to look at the books is disingenuous to the extent that the Project was being operated out of Maynard's home.  The plaintiffs who went there to visit Maynard should not be expected to pilfer through his personal file cabinet in order to find the materials

---

[10] Plaintiffs suggest that a fiduciary-defendant is precluded indefinitely from raising a statute of limitations defense. Whether one calls it statute of limitations or laches or unreasonable delay, a defendant is always entitled to argue to the court that a plaintiff has waited too long to vindicate his or her rights.

that were ultimately handed over in discovery (i.e., the materials that revealed Maynard's wrongdoing).

The guiding principle behind the doctrine of equitable tolling is that the law should be used to achieve some approximation of justice rather than to perpetrate fraud. "To credit the defendants' anti-tolling argument would seriously diminish the [investors'] entitlement to rely on the good faith of their corporate fiduciaries, and create the precise corrosive effect that the Chancellor in Kahn v. Seaboard Corp. quite properly held must be avoided." In re MAXXAM, Inc., 1995 WL 376942, at *8. The district court judge properly determined that the equities in this case demanded that tolling be applied. Had these plaintiffs waited twenty years to sue, this case would obviously have a different feel. To the extent that this decision required a judgment call on the part of the district court, we find that its judgment in this case was within the realm of its discretion.

Considering the fact that the more general equitable tolling doctrine provides an adequate basis to affirm, we need not discuss whether fraudulent concealment tolling would also be appropriate. We thus find it unnecessary to revisit the issue of whether the attention of each individual defendant was diverted by the misrepresentations that Maynard made. We are satisfied with the district court's conclusion that Maynard's hands were sufficiently dirty to deprive him of the statute of limitations defense.

We turn briefly to the issue of punitive damages.  The district court explained its decision to deny the plaintiffs' request for punitive damages as follows:

> As a general rule, punitive damages are not recoverable for breach of contract under Delaware law.  Under Delaware law, punitive damages for breach of fiduciary duty may be awarded, but only upon proof that the Defendant acted maliciously for the purpose of injuring the Plaintiff.
>
> In this regard, the Plaintiff carries an extraordinary burden because punitive damages are awarded not as compensation, but as punishment to the wrongdoer for willful or wanton conduct.  While I certainly do not condone Mr. Maynard's conduct in this case -- in particular, I refer to my findings with respect to his misrepresentations and his self-dealing -- I find that the Plaintiffs have not met their burden of demonstrating malice.  And while the end result of Mr. Maynard's conduct resulted in a deprivation of Plaintiffs' money for a significant period of time, there's no proof that he withheld the money out of malice for the purpose of injuring them.

The plaintiffs argue that the district court erroneously required them to demonstrate malice before it would even consider awarding punitive damages.  Maynard does not specifically challenge the plaintiffs' suggestion that the lower court applied a test more demanding than that required by Delaware law with regard to punitive damages.  Rather, Maynard insists that even *had* malice been shown, the question of whether to award punitive damages is committed to the discretion of the district court judge, subject

only to abuse of discretion review.  See Jardel Co. v. Hughes, 523 A.2d 518, 527-28 (Del. 1987).

According to Littleton v. Young, 608 A.2d 728 (Del. 1992) (table) (available at 1992 WL 21125), "[t]he standard which governs the award of punitive damages in Delaware is well settled. . . . In actions arising ex contractu, punitive damages may be assessed if the breach of contract is characterized by willfulness or malice." Id. at *2.[11]  Whatever the subtle differences between willfulness and malice may be, we need not explore them here.  The district court properly apprehended the standard for punitive damages, as explained in Littleton, and to the extent that the facts in this case, in its mind, did not rise to the level of willfulness or malice, we find no abuse of discretion.

V.

For all of the foregoing reasons, we affirm.

---

[11] Cloroben Chemical Corp. v. Comegys, 464 A.2d 887, 891 (Del. 1983), offered by the plaintiffs in support of their argument that the district court applied the wrong legal standard, dealt with a tort rather than a contract action, and is therefore inapposite. The Littleton standard for assessing punitive damages in contract cases such as this one offers clear guidance.

-26-